424 F.2d 745
 Clair D. KNIERIM, Plaintiff-Appellee,
v.
ERIE LACKAWANNA RAILROAD COMPANY, Defendant-Appellant.
Donald J. CASHIN, Plaintiff-Appellee,
v.
ERIE LACKAWANNA RAILROAD COMPANY, Defendant-Appellant.
Joseph R. SAMPSON, Plaintiff-Appellee,
v.
ERIE LACKAWANNA RAILROAD COMPANY, Defendant-Appellant.
 Nos. 600-02.
 Dockets 34323-25.
 United States Court of Appeals, Second Circuit.
 Submitted March 12, 1970.
 Decided April 22, 1970.
 
 Lloyd W. Roberson, and Vincent E. McGowan, New York City, for defendant-appellant.
 Arnold B. Elkind, New York City, for plaintiffs-appellees.
 Before SMITH, KAUFMAN and HAYS, Circuit Judges.
 HAYS, Circuit Judge.
 
 
 1
 In these actions brought under the Federal Employers' Liability Act, 45 U.S.C. §§ 51 et seq. (1964), appellees sought to recover damages for injuries sustained when two of appellant's trains, on which appellees were crew members, met in a head-on collision. After a trial before Judge Thomas F. Murphy and a jury in the United States District Court for the Southern District of New York, the court, upon appellees' motion, directed a verdict against the appellant Railroad on both the issue of appellant's negligence and the issue of appellees' contributory negligence. The issue of damages was submitted to the jury, which returned a verdict in the amounts of $140,000 for appellee Knierim, $40,000 for appellee Cashin and $30,000 for appellee Sampson. Judgment was entered thereon from which the Railroad appeals.
 
 
 2
 We find no error and accordingly affirm the judgment below.
 
 
 3
 The Railroad first contends that the district court erred in directing a verdict on the issue of its negligence and appellees' contributary negligence. The head-on collision between appellant's eastbound light engine 919,[1] designated as train X150, and appellant's westbound engine 448, designated as the Passaic Drill, occurred on August 29, 1967, near Passaic, N. J., on appellant's eastbound track 2. At the time of the accident, the Passaic Drill was returning against the current of traffic on the main track from the Continental Can Company siding, where it had been performing switching operations, to the Manhattan Rubber Company siding. When the train went east to the Continental Can Company siding to perform the switching operations, Harry Fitchik, conductor of the Passaic Drill, had been left behind at the Manhattan Rubber Company siding to act as flagman until the train returned. The flagman's duty was to protect the train from the rear, here the west, by flagging, and with fusees and torpedoes if necessary. An automatic block signal system was also in effect over the portion of the main track between the Continental Can Company siding and the Manhattan Rubber Company siding, so that, if the signals were working properly,[2] a train entering the main track from the Continental Can Company siding would first cause signal 102, located near the Continental Can Company siding, to go red and as it moved west would cause signal 112, located near the Manhattan Rubber Company siding, in turn to go red. As signals 102 and 112 went red, warning of an obstruction in their respective blocks of track, signals farther to the west would also be affected, that is, they would display various intermediary warning colors between green or clear and red. In this manner, the automatic block signal system should have warned an eastbound train of the entry of the Passaic Drill onto the main track ahead of it.[3]
 
 
 4
 Eastbound train X150 on the day of the accident consisted of an engine without any cars en route to Hoboken where the engine would become the motive power for a westbound passenger train. The engine comprising train X150 was running backwards. The fireman, the engineer and the conductor had the duty of calling out signals as train X150 proceeded eastward. However, according to the testimony of appellee Sampson, a crew member of the X150, the only signal called just before the accident was an approach signal at signal 112.
 
 
 5
 The only reasonable conclusion that can be drawn from the facts of this case is that either Fitchik did not flag and the signals were not in proper working order or the crew members of the X150 calling signals were not properly observant. In either event the Railroad was negligent as a matter of law. No alternative cause not involving negligence on the part of the Railroad has been suggested and indeed it is almost inconceivable that one could exist.
 
 
 6
 "The time will probably never come when a collision resulting from an attempt to have two trains going at full speed, in opposite directions, pass each other on the same track, will not be held to be negligence, in law." Rouse v. Hornsby, 67 F. 219, 221 (8th Cir. 1895).
 
 
 7
 Since under Rogers v. Missouri Pac. R. Co., 352 U.S. 500, 508, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957), the railroad's negligence, to be actionable in an FELA case, need play only a part, however slight, in producing the injury for which damages are sought, the district court was correct in directing a verdict against the Railroad on the issue of negligence. See United States v. Grannis, 172 F.2d 507 (4th Cir.), cert. denied, 337 U.S. 918, 69 S.Ct. 1160, 93 L.Ed. 1727 (1949); Prosser, Handbook of the Law of Torts, § 43, at 212 (2d ed. 1955).
 
 
 8
 Nor was there any evidence from which the jury could reasonably infer that any of the appellees had been contributorily negligent in causing the accident.
 
 
 9
 The only claim against appellees Knierim and Cashin, who served as brakemen on the Passaic Drill, is that they failed to make certain that the Passaic Drill had proper clearance to operate against traffic. Before the Passaic Drill left the Manhattan Rubber Company for the Continental Can Company siding, Fitchik, who as conductor was primarily responsible for the safety of the train, had undertaken to flag oncoming trains and to call the dispatcher to obtain clearance for the moves of the train.[4] Appellees had no reason to anticipate that Fitchik would fail to perform properly these duties which were primarily his responsibility, as the man in charge of the crew, rather than theirs. To require a railroad employee to act at his peril in relying on a superior's undertaking to perform a particular task would be inimical to the purpose of the FELA. Cf. Tiller v. Atlantic Coast Line R. Co., 318 U.S. 54, 66-67, 63 S.Ct. 444, 87 L.Ed. 610 (1943). Knierim and Cashin must be held to have acted prudently in relying on their superior's express representations that he would protect and clear the train's movements. See Paluch v. Erie Lackawanna R. Co., 387 F.2d 996, 999 (3rd Cir. 1968).
 
 
 10
 The only claim that the Railroad makes against appellee Sampson, a ticket collector-brakeman in passenger service who was a crew member of train X150, is that he failed to aid in calling out signals. Train X150 usually carried a passenger car, to give the train additional braking capacities, and Sampson normally rode in the passenger car with the conductor. His duties in that situation were to make sure the train was not going too fast and was on the right track. On this trip, no passenger car was being carried and the cab of the engine was occupied by the conductor, the engineer, the fireman and Sampson.
 
 
 11
 Rule 34 of the Railroad's operating rules provides:
 
 
 12
 "All members of engine and train crews must, when practicable, communicate to each other by its name the indication of each signal affecting the movement of their train or engine." (Emphasis added.)
 
 
 13
 The fireman, the engineer and the conductor were occupying all the available positions from which the signal indications were visible. It was therefore quite impossible for Sampson to aid in calling out signals. Moreover the fireman, the engineer and the conductor had been regularly calling out signals as the train proceeded eastward. Therefore, even assuming it might have been possible for Sampson somehow to place himself in a position to call the signals, it would be unreasonable to infer that Sampson was negligent in relying on the others to perform this task properly. Indeed, it is almost inconceivable that his failure to do so, when three other crew members were already performing the task, had any causal connection with the accident.
 
 
 14
 We conclude that it was not error for the district court to direct a verdict for appellees on the issue of contributory negligence. See Paluch v. Erie Lackawanna R. Co., supra at 999.
 
 
 15
 The Railroad also claims that the trial judge erred in refusing to allow a division superintendent of the Railroad to testify as to the meaning of Rule 106 of the Railroad's operating rules. Rule 106 provides:
 
 
 16
 "Both conductor and engineman are responsible for the safety of the train and the observance of the Rules and, under conditions not provided for by the Rules, must take every precaution for protection. This does not relieve other employees of their responsibilities under the Rules."
 
 
 17
 We find no error in the exclusion of the proffered testimony. Not only does the meaning of the rule appear clear on its face, but an assistant superintendent of the Railroad had already testified that Rule 106 required every crew member to apply and be guided by the operating rules and to question any departure by superiors or fellow employees. This testimony was sufficient to establish the "customary and practical construction" of the rule. See Wiggins v. Powell, 119 F.2d 751, 753 (5th Cir.), cert. denied, 314 U.S. 649, 62 S.Ct. 94, 86 L.Ed. 520 (1941).
 
 
 18
 Finally, the Railroad contends that the trial court abused its discretion in denying the Railroad's motion for a new trial on the ground that the verdicts were excessive. The medical evidence introduced at trial as to the injuries sustained by appellees as a result of the accident provides no basis for such a finding. In view of this evidence, we cannot say that the jury's assessment of damages was so high as to shock the conscience or constitute a "denial of justice." See Grunenthal v. Long Island R.R. Co., 393 U.S. 156, 159, 89 S.Ct. 331, 21 L.Ed.2d 309 (1968).
 
 
 19
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 A "light" engine is one that carries no cars
 
 
 [2]
 The last inspection of signal 112 before the date of the accident was on August 28, 1967. The last inspection of signal 102 was on August 10, 1967. Both signals were found to be in good working order on those dates. No other evidence as to the proper functioning of the signals at the time of the accident was introduced at trial
 
 
 [3]
 Since the signals faced only the normal current of traffic, a westbound train would have no similar warning of the approach of an eastbound train
 
 
 [4]
 Howard E. Oakley, Jr., the dispatcher, testified that he received a call from Fitchik asking "if he could go to Continental Can, do the drilling, and come back to Manhattan Rubber after train 1172 went by them." Oakley told him that he could not do so, since train X150 was running about ten minutes behind train 1172. Fitchik said nothing further to the dispatcher