731 F.2d 1042
 Carol A. CRANE, Individually and as Administratrix of the
Goods, Chattels and Credits which were of Peter A.
Crane, deceased, Plaintiff-Appellee,
v.
CONSOLIDATED RAIL CORPORATION, Defendant-Appellant.
 No. 454, Docket 83-7459.
 United States Court of Appeals,
Second Circuit.
 Argued Nov. 23, 1983.
Decided March 30, 1984.
 
 Henry G. Miller, White Plains, N.Y. (Lawrence T. D'Aloise, Clark, Gagliardi & Miller, P.C., White Plains, N.Y.), for plaintiff-appellee.
 Richard J. O'Keeffe, White Plains, N.Y. (O'Keeffe & Moloney, White Plains, N.Y.) for defendant-appellant.
 Before FRIENDLY, MANSFIELD and KEARSE, Circuit Judges.
 FRIENDLY, Circuit Judge:
 
 
 1
 This is an appeal by defendant Consolidated Rail Corporation (Conrail) from a judgment of the District Court for the Southern District of New York, after a jury verdict in a second trial in an action under the Federal Employers' Liability Act (FELA), 45 U.S.C. Secs. 51 et seq., awarding damages of $1,750,000 for the wrongful death of Peter Crane, an employee of Conrail. This judgment compared with an award of $425,000, reduced by 50% for contributory negligence, awarded by a jury at the first trial. Conrail urges that the district court erred in directing a new trial at all and particularly so in directing a new trial on the issue of damages. Conrail also attacks the damages award at the second trial as excessive. Although the issues are close, we hold that directing a new trial on the issue of contributory negligence was within the court's discretion but that, on the facts here, directing that the trial encompass the issue of damages was not. We therefore do not reach the issue of excessiveness of the damages awarded at the second trial.
 
 The First Trial
 
 2
 Crane's death came about as a result of impact from a Conrail train early in the afternoon of December 5, 1980. Crane was part of the carpentry work crew of Conrail's Harmon, New York station yard. Thomas Conway was foreman of the crew; the other members were Henry LeClerc, Cecil Walker and John Fatone.
 
 
 3
 During the morning of December 5 Conway learned that the cross-walks at the Scarborough Station needed repair. There are four sets of tracks at that station, tracks 1 and 3 being the northbound track with track 3 nearest to the northbound platform. That morning track 1 had been closed for repairs and all northbound trains operated over track 3. The walkway requiring repair was a wooden cross-over; the job involved cutting planks to replace the rotten planks in the walkway adjacent to track 3 near the northbound platform. To the right of the northbound platform was a chainlink fence which separated the platform from the parking area.
 
 
 4
 Rule 3204 of Conrail's Safety Rules provides that "[f]oremen are responsible for a safe operation and must exercise every reasonable precaution to protect men in their charge", and Rule 101 of its Rules for Conducting Transportation provides that "[a]ny work on or adjacent to a track which may create a condition interfering with the safe movement of trains at normal speed or the use of equipment which may foul adjacent tracks, must not be attempted without the permission of the train dispatcher."[1] Foreman Conway made no request for such permission; although it was within the foreman's discretion to seek permission, the train dispatcher testified that if permission had been sought, he would not have granted it in view of the concentration of northbound traffic on track 3.
 
 
 5
 Rule 3204 of Conrail's Safety Rules also provides that the foreman "will assign gang watchmen when and where necessary as well as advance watchmen when needed." Conway assigned LeClerc as the watchman. Rule 3203 of the Rules requires that only qualified employees may be assigned as watchmen, and that gang watchmen must have an approved qualification card. LeClerc did not have the card, having neither attended classes nor received instructions about being a watchman, but had acted as a flagman or watchman on numerous other occasions. Although Rule 3206 of the Safety Rules provides that an advance gang watchman must have a warning whistle, a standard white disc and a red flag, LeClerc carried only an airhorn. He placed himself about 300 feet south of where the men were working. Shortly thereafter, a train came along on track 3. LeClerc sounded his airhorn and the men cleared the area.
 
 
 6
 When the work crew arrived at the station, it was decided that any necessary cutting of planks would be done by a hand-operated chain saw on the tailgate of a Conrail truck in the parking lot. LeClerc testified that he so understood the plan. A few pieces of lumber were cut in this manner; Crane volunteered to do the cutting since he was more experienced than Fatone with the chain saw.
 
 
 7
 Fatone testified that later "for some reason we felt that it would be better to go inside the gate off the edge of this concrete to cut this 4 by 6 because we could stand on it and one guy can cut on it; and that's what happened." App. at 314a. Crane, Conway and Fatone were all standing on the plank, with Crane closest to the track, looking away from it and operating the chain saw, which made a very loud noise.[2] According to Conway, "it appeared as though he [Crane] was just inside of the yellow line", id. at 224a--apparently the line beyond which passengers were not to go toward the track. Walker had been nailing some planks in the track area and was about to sit down.
 
 
 8
 Just at this time a second northbound train approached. LeClerc sounded his airhorn[3] but the noise of the saw drowned it out. The train hit Walker's legs and either the train or Walker's body hit Crane; both were killed immediately.
 
 
 9
 Conrail's Safety Rule 3207 provides that a watchman will not place himself farther from the gang than his warning whistle will be distinctly heard, and Rule 3208 requires a watchman to warn the crew of an approaching train at least fifteen seconds before the train reaches the point of the work. A reenactment of the accident performed as part of an investigation made by Conrail's Superintendent of Safety showed that from LeClerc's position as watchman his airhorn was not audible while the men were using the chain saw. The investigators concluded that there were violations of Conrail Safety Rules 3204 and 3207(b) "in that [the] foreman did not take every precaution to protect men in his charge by providing [an] additional watchman." Conrail Memorandum of Investigation at 2 (Dec. 6, 1980). No fault was found with respect to Crane.
 
 
 10
 With respect to damages, plaintiff's counsel did not call an economic expert at the first trial. Counsel did show that at the time of his death Crane was in excellent health and was survived by a thirty-three year old wife and four year old son to whom he was deeply devoted. He had been employed by Conrail for six years and was highly regarded by all who knew him. He had served as president of his local union. He performed carpentry and other work at his own home, took care of the household books, checks and finances, and was careful about expenses. He had dreamed of opening his own contracting business. Counsel did not, however, reduce any of this evidence to statistical form, other than presenting copies of Crane's income tax returns filed jointly with his wife for 1978, 1979 and 1980. He contented himself with cross-examining Conrail's economic expert, Dr. Jerome Staller, with respect to the latter's figure of $284,000 present value for lost future earnings and fringe benefits, as described below, and suggesting a total award of $2,500,000 when making his summation to the jury.
 
 
 11
 Dr. Staller had estimated Crane's future earnings on the basis that Crane would remain with the railroad until age fifty-eight, and would receive the wage increases provided by contract through 1982 and other increases based on the Railroad Retirement Board's projected earnings growth "that run from [a] 7.1 percent increase [for 1983], 6.1 percent a few years after that, and then 5.735 percent [for 2000 to retirement]." App. at 492a. He testified that inflation was built into these figures. Id. at 540a-41a. Dr. Staller did not consider the possibilities that Crane would be promoted or might leave the railroad's employ for a higher paying job. He deducted 31.9% for taxes until 1995 and 33.1% thereafter until retirement, and assumed personal maintenance ranging from 14.9% to 25%. He selected an interest rate of 12% for the gross recovery, which was based on the average rate of return over the past year for municipal bonds, and a reinvestment rate of 6.7% for the interest earned at the 12% rate. Using these rates as the rate of discount in a "two-step process", Staller determined that the present value of Crane's future earnings was $247,204. To this amount he added $36,801 for lost fringe benefits, making a total of $284,005. He made no estimate of the claim for loss of Crane's services in the household and nurture and plaintiff's counsel did not supply one.
 
 
 12
 Plaintiff's counsel questioned several of the assumptions used in Dr. Staller's analysis and asked him to make another calculation using hypothetical figures supplied by counsel. For instance, counsel requested Staller to assume that Crane would remain working at the railroad until age sixty-five, that he would receive annual wage increases of 10% (a figure which presumably accounted for inflation), and that the discount rate would be 7.75%, less deductions for federal taxes. Id. at 534a. Based on these figures, Staller calculated a present value of $782,000 for Crane's future lost earnings. Defendant's counsel moved that the court strike this calculation on the ground that the assumptions supplied by plaintiff's counsel had no support in the record and were epurely speculative. The court denied the motion and allowed the jury to consider this alternative analysis when determining Crane's future lost earnings.
 
 
 13
 In answer to questions put by the court the jury found that defendant had been negligent, that plaintiff had been contributorily negligent, and that the degree of his contributory negligence was 50%. The jury answered questions on damages as stated in the margin.[4]The Motion for a New Trial
 
 
 14
 Plaintiff moved to set aside the verdict and for a new trial on the grounds that the diminution of recovery by 50% as a result of Crane's contributory negligence was not supported by the evidence and that the award of damages was inadequate and resulted from an error in the charge on discounting. Chief Judge Motley granted the motion in a memorandum opinion.
 
 
 15
 The judge dealt mainly with the finding that Crane's negligence constituted 50% of the total. She began with this court's opinion in Bevevino v. Saydjari, 574 F.2d 676, 683-84 (2 Cir.1978), where we approved the standard for granting new trials on the ground that the verdict was against the weight of the evidence set forth in 6A Moore's Federal Practice p 59.08, at 59-147 to 59-150 (2d ed. 1983) (footnotes omitted):
 
 
 16
 The trial judge, exercising a mature judicial discretion, should view the verdict in the overall setting of the trial; consider the character of the evidence and the complexity or simplicity of the legal principles which the jury was bound to apply to the facts; and abstain from interfering with the verdict unless it is quite clear that the jury has reached a seriously erroneous result. The judge's duty is essentially to see that there is no miscarriage of justice. If convinced that there has not [sic] been then it is his duty to set the verdict aside; otherwise not.
 
 
 17
 She thought it was "quite clear that the jury has reached a seriously erroneous result." She said she had initially indicated that she would not even charge with respect to contributory negligence but had decided to include the charge "on the theory that it was conceivable, however unlikely, that the jury might find that Crane should have protested the unsafe conditions and did not." She thought that such a finding "could in no way support a verdict of fifty percent contributory negligence, nor, indeed, anything over five percent." She pointed out that at the time of his death Crane was working with two other railroad employees and that "[i]f Crane was negligent, so were his co-workers." More important, at least in our view, were her criticisms of the foreman whose "behavior fell shockingly below the reasonable man standard." Altogether, "to allow the contributory negligence finding to stand would be a miscarriage of justice." Since, in the judge's view, allowing the finding of damages to stand but eliminating the halving for contributory negligence would result in an additur prohibited by the 5-4 decision in Dimick v. Schiedt, 293 U.S. 474, 486-88, 55 S.Ct. 296, 301-02, 79 L.Ed. 603 (1935), which we have recently applied to a remittitur on the percentage of contributory negligence in Akermanis v. Sea-Land Service, Inc., 688 F.2d 898, 902-03 (2 Cir.1982), cert. denied, --- U.S. ---, 103 S.Ct. 2087, 77 L.Ed.2d 298 (1983), a new trial on the issue of contributory negligence was required.
 
 
 18
 Turning to the issue of damages, the judge recognized that "[w]here, as here, the jury has rendered a detailed special verdict, the court may properly separate the issues of contributory negligence and damages for retrial purposes," citing Akermanis, supra, 688 F.2d at 906-07. She thought, however, that
 
 
 19
 on the facts here, the court believes that the finding of damages and that of contributory negligence are sufficiently related that the jury's damage finding may also have been tainted by the misconception of the law and the evidence.
 
 
 20
 Accordingly she also directed a new trial on the issue of damages.
 
 The Second Trial and the Appeal
 
 21
 The second trial took a surprising turn. Defendant, which had so vigorously asserted Crane's contributory negligence at the first trial, now chose not to present any evidence on the point. The court accordingly granted plaintiff's motion for a directed verdict on the issue of contributory negligence. Plaintiff who had presented no economic witness at the first trial, now called Dr. Thomas Kershner, a qualified economist, who testified to a total economic loss of $2,851,008. Defendant again called Dr. Staller to testify as an economic witness. Making several revisions of his earlier analysis, Dr. Staller calculated a total discounted present value of $418,897 for loss of future income and fringe benefits. The jury found damages of $1,750,000. Defendant's motion to set this aside as excessive was denied.
 
 
 22
 On appeal, as indicated, Conrail contends that the award of the jury in the first trial should not have been set aside; that in any event its award of damages should not have been set aside; and that the damage award at the second trial was excessive.
 
 DISCUSSION
 
 23
 It is undisputed that Chief Judge Motley correctly defined the standard governing whether or not to grant a new trial on the ground that the determination that Crane's negligence constituted 50% of the total, 45 U.S.C. Sec. 53, was against the weight of the evidence. The question is whether she applied the standard correctly--more accurately, whether her determination that the standard was met constituted an "abuse of discretion", see 6A Moore's Federal Practice, supra, p 59.08, at 59-151, 59-152. Although the Moore treatise says that "rarely can this be shown", it cites several cases where appellate courts have done this. See Indamer Corp. v. Crandon, 217 F.2d 391 (5 Cir.1954); Lind v. Schenley Industries, 278 F.2d 79 (3 Cir.) (en banc), cert. denied, 364 U.S. 835, 81 S.Ct. 58, 5 L.Ed.2d 60 (1960); Fireman's Fund Insurance Co. v. Aalco Wrecking Co., 466 F.2d 179 (8 Cir.1972), cert. denied, 410 U.S. 930, 93 S.Ct. 1371, 35 L.Ed.2d 592 (1973). In the Lind case there were two excellent and instructive opinions by distinguished appellate judges. Chief Judge Biggs, writing for a large majority, had this to say, 278 F.2d at 90:
 
 
 24
 But where no undesirable or pernicious element has occurred or been introduced into the trial and the trial judge nonetheless grants a new trial on the ground that the verdict was against the weight of the evidence, the trial judge in negating the jury's verdict has, to some extent at least, substituted his judgment of the facts and the credibility of the witnesses for that of the jury. Such an action effects a denigration of the jury system and to the extent that new trials are granted the judge takes over, if he does not usurp, the prime function of the jury as the trier of the facts. It then becomes the duty of the appellate tribunal to exercise a closer degree of scrutiny and supervision than is the case where a new trial is granted because of some undesirable or pernicious influence obtruding into the trial. Such a close scrutiny is required in order to protect the litigants' right to jury trial.
 
 
 25
 Judge Hastie wrote in a dissent, joined by Judge Kalodner, id. at 91:
 
 
 26
 This traditional conception of the role of the trial judge has provided the one important limitation on the power of the jury to make an unimpeachable decision on the facts, even where the evidence is conflicting. The judge may not substitute the verdict he would have rendered on the evidence for that actually rendered by the jury. But he may avoid what in his professionally trained and experienced judgment is an unjust verdict by vacating it and causing the matter to be tried again by a second jury. Thus, the essential institution of jury trial is respected and an expedient middle ground is maintained between the absence of any control over a jury's verdict on conflicting evidence, on the one hand, and judicial usurpation of the fact finding function, on the other.
 
 
 27
 Under this scheme the only function of a reviewing court, once the trial court has ordered a new trial, is to see whether there can have been any basis in reason for the trial judge's conclusion as to the weight of the evidence and the injustice of the verdict.
 
 
 28
 Drawing on both opinions we agree with Chief Judge Biggs as to the need of particularly close appellate scrutiny where the trial judge grants a new trial solely because the judge regards the verdict as against the weight of the evidence but with Judge Hastie that the test is "whether there can have been any basis in reason for the trial judge's conclusion as to the weight of the evidence and the injustice of the verdict."
 
 
 29
 We do not find the verdict so irrational as did the district judge. Cutting the last piece of timber on a platform close to the northbound track, with the chain saw making a noise that obliterated the sound of the watchman's horn, should have been perceived by an experienced workman like Crane to be a dangerous practice. An employee should exercise due care with respect to his workplace. See, e.g., Atlantic Coast Line Railroad v. Davis, 279 U.S. 34, 36, 49 S.Ct. 210, 73 L.Ed. 601 (1929); Foreman v. Texas & New Orleans Railroad, 205 F.2d 79, 81 (5 Cir.1953); Robichaux v. Kerr McGee Oil Industries, 317 F.Supp. 587, 592 (W.D.La.1970). If an employee finds himself in an unsafe workplace, common sense suggests that he should notify his employer of the problem. See Dennis v. Denver & Rio Grande Western Railroad, 375 U.S. 208, 209-10, 84 S.Ct. 291, 292-93, 11 L.Ed.2d 256 (1963); White v. St. Louis-San Francisco Railway, 539 S.W.2d 565, 569 (Mo.Ct.App.1976); 56 C.J.S. Master and Servant Sec. 393 (1948 & Supp.1983). Here, moreover, there was no evidence that Conway directed that the last piece of timber be cut on the platform or assured Crane and Fatone that all would be well, as in Knierim v. Erie Lackawanna Railroad, 424 F.2d 745, 747 (2 Cir.1970). Although he surely acquiesced in what appears to have been a joint decision, nothing suggests that if Crane had made even a mild objection, it would have gone unheeded. Thus we do not agree with the district judge that a finding that anything over 5% of the fault was due to Crane would have been against the weight of the evidence.
 
 
 30
 Still we cannot say that there was "no basis in reason" for the judge to conclude that an assessment of 50% against Crane was too high.[5] Many cases under the FELA, 45 U.S.C. Secs. 51 et seq., and the Jones Act, 46 U.S.C. Sec. 688, emphasize the primacy of an employer's duty to furnish employees with a safe place to work. See, e.g., Bailey v. Central Vermont Railway, 319 U.S. 350, 352-53, 63 S.Ct. 1062, 1063-64, 87 L.Ed. 1444 (1943); Duncan v. St. Louis-San Francisco Railway, 480 F.2d 79, 83 (8 Cir.), cert. denied, 414 U.S. 859, 94 S.Ct. 69, 38 L.Ed.2d 109 (1973); Spinks v. Chevron Oil Co., 507 F.2d 216, 223 (5 Cir.1975) (Wisdom, J.); Ragsdell v. Southern Pacific Transportation Co., 688 F.2d 1281, 1283 (9 Cir.1982) (per curiam). The employer can draw on a wealth of experience and embody its teachings in rules, as was done here; the employee may well be facing the danger for the first time. Moreover, the employer often is responsible for the safety of several persons--as here notably for Walker--whereas the employee is responsible only for himself. The railroad committed numerous acts of negligence as compared to Crane's single one. Here, although Crane was not free to act in disregard of his own safety, the ultimate responsibility was Conway's. The foreman's willingness to permit the work to be done, apparently for no compelling reason, under what quite apparently were dangerous conditions, without taking any added precautions because of the noise created by the chain saw, could properly be deemed by the judge to have been a much more serious breach of duty than Crane's carelessness in going along with the change of workplace. Moreover, as developed by Dean Prosser, this similarity of language between negligence and contributory negligence tends to obscure that, in contrast to negligence,
 
 
 31
 [c]ontributory negligence involves no duty, unless we are to be ingenious as to say that the plaintiff is under an obligation to protect the defendant against liability for the consequences of his own negligence.
 
 
 32
 The Law of Torts Sec. 65, at 418 (4th ed. 1971) (footnote omitted). If Conrail had greater responsibilities than Crane, as it did, the judge had a rational basis for thinking that an allocation of 50% of the total fault to him was "seriously erroneous". We thus cannot find that she abused her discretion by setting aside so much of the verdict as found that Crane's responsibility for the accident was equal to Conrail's.
 
 
 33
 We take a different view with respect to so much of the order as directed a new trial on the issue of damages. It was held in Gasoline Products Co. v. Champlin Refining Co., 283 U.S. 494, 51 S.Ct. 513, 75 L.Ed. 1188 (1931), prior to adoption of the Federal Rules of Civil Procedure, that while at common law there was no practice of setting aside a verdict in part, the Seventh Amendment did not command adherence to that rule. "All of vital significance in trial by jury is that issues of fact be submitted for determination with such instruction and guidance by the court as will afford opportunity for that consideration by the jury which was secured by the rules governing trials at common law." Id. at 498, 51 S.Ct. at 514. In consequence, "where the requirement of a jury trial has been satisfied by a verdict according to law upon one issue of fact, that requirement does not compel a new trial of that issue even though another and separable issue must be tried again." Id. at 499, 51 S.Ct. at 514. Fed.R.Civ.P. 59(a) permits the grant of a new trial "on all or part of the issues", with the Notes of the Advisory Committee referring to the Gasoline Products decision.
 
 
 34
 The Gasoline Products case involved a claim by the plaintiff for breach of a license contract on which the jury had rendered an award in plaintiff's favor and a counterclaim by defendant for plaintiff's breach of a construction contract on which the jury had rendered a verdict in defendant's favor. The court of appeals, having ruled that there was an error in the charge with respect to damages on the counterclaim, limited the new trial to the determination of such damages. Although approving the refusal to grant a new trial with respect to plaintiff's claim, the Supreme Court held it was error to limit the new trial on the counterclaim to the issue of damages, since, although "[t]he verdict on the counterclaim may be taken to have established the existence of a contract and its breach", id., there were many facts relating to the date of formation, terms and breach of the construction contract that the new jury would have to determine in order to make an intelligent award of damages. It was in this context that the Court said, in ordering a new trial as to both liability and damages on the counterclaim,
 
 
 35
 Where the practice permits a partial new trial, it may not properly be resorted to unless it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice[,]
 
 
 36
 id. at 500, 51 S.Ct. at 515, and concluded that
 
 
 37
 [h]ere the question of damages on the counterclaim is so interwoven with that of liability that the former cannot be submitted to the jury independently of the latter without confusion and uncertainty, which would amount to a denial of a fair trial[,]
 
 
 38
 id. The Court's concern was thus with the ability of the second jury to function under the limitation imposed by the court of appeals.
 
 
 39
 In Rivera v. Farrell Lines, Inc., 474 F.2d 255, 259 n. 5 (2 Cir.), cert. denied, 414 U.S. 822, 94 S.Ct. 122, 38 L.Ed.2d 55 (1973), an action under the Jones Act, which adopted the FELA principle with respect to comparative negligence, Judge Oakes, writing for this court, suggested a procedure of special interrogatories which was designed to insulate the various elements in a recovery under that statute so as to facilitate the grant of partial new trials where error was found only with respect to one. The clear implication was that if such a procedure was followed, as was done here, error with respect to one issue will ordinarily not constitute reason to retry an issue that was separately determined. Drawing upon this teaching, we held in Akermanis v. Sea-Land Service, Inc., supra, 688 F.2d at 906, that where special interrogatories had independently established the amount of plaintiff's damages, a trial judge's rejection of a verdict that plaintiff was only 4% responsible for an accident did not require a new trial on damages if the judge did not deem this necessary. Responding to defendant's contention "that any retrial should include redetermination of damages since the jury might have perceived comparative negligence as closely related to damages and might have allowed its determination of damages to be influenced by its erroneous finding of relative fault," id. (footnote omitted), we said that "when a jury arrives at its decision by detailed special verdicts, enabling a trial or a reviewing court to be reasonably certain that an erroneous verdict was reached independent of another verdict, a partial retrial may be in order", id., and that "[a]lthough it is possible that the jury's special verdicts encompassed some undisclosed compromise, absent obvious inconsistencies we will not presume that the jury's findings represent anything other than good faith responses to the questions presented," id. Akermanis thus establishes that if Chief Judge Motley had limited the new trial to the issue of comparative negligence, we would have upheld her. Our question is the somewhat different one whether, recognizing the discretion accorded to the district judge with respect to the grant of new trials, we should reverse when she did not.
 
 
 40
 The memorandum opinion of the district judge, which we have quoted above, casts little light on why a retrial of the damages issue was thought to be necessary. Clearly a jury retrying only the issue of comparative fault would not have faced the insuperable difficulties that would have confronted a jury attempting to try only the issue of damages in the Gasoline Products case--the point to which the cautionary language of that opinion was addressed. The judge did not find that the verdict with respect to damages at the first trial was against the weight of the evidence, and there would have been no basis for doing so. There is nothing to suggest that it was a compromise between jurors who believed that Crane was entitled to larger damages and others who believed that Conrail was not liable at all, as in the classic cases of Simmons v. Fish, 210 Mass. 563, 97 N.E. 102 (1912), and Schuerholz v. Roach, 58 F.2d 32 (4 Cir.1932), also cited in the Advisory Committee's Note to Fed.R.Civ.P. 59, where juries had rendered verdicts of a few hundred dollars for the loss of an eye and the defendant was held to be entitled to a new trial on the issue of liability as well as on that of damages because of the obvious compromise character of the verdict. Here the evidence as to Conrail's liability was overwhelming and the verdict on damages was in line with the testimony of its expert, the only economic witness at the first trial. However much we may sympathize with the plaintiff, it is of no legal significance that the first jury might well have awarded higher damages if it had heard the evidence on that subject offered by plaintiff at the second trial. Neither is there any reason to believe that the substantial damage award represented some undisclosed impermissible compromise wherein jurors wishing to make a larger damage award were sustained by a threat that unless they yielded other jurors would insist on an even higher percentage for Crane's comparative fault, rather than "good faith responses to the questions presented", see Akermanis, supra, 688 F.2d at 906. The trouble with the verdict at the first trial lay not in the amount of damages awarded, which was well related to the evidence, but in the jury's having cut plaintiff's recovery in half by finding that Crane's contributory fault amounted to 50% rather than a lesser percentage or even to none. A "misconception of the law and the evidence" with respect to the degree of contributory fault would not affect the jury's determination of the damages resulting from Crane's untimely death. Akermanis constitutes authority, if such were needed, against the proposition that simply because the jury could rationally be found to have erred seriously with respect to one issue, the judge should infer that it also erred seriously with respect to the other. The judge's suggestion of "taint" could well have been influenced by her belief that a finding of more than 5% comparative fault would have been irrational--a view with which, for reasons stated above, we do not agree.
 
 
 41
 In sum, we find no adequate basis in the record or in the judge's memorandum opinion for her directing the issue of damages to be retried simply because the jury had assessed too large a degree of fault against Crane. Recognizing the defense owed to the trial judge because of her superior opportunity to get the "feel of the case", Cone v. West Virginia Pulp & Paper Co., 330 U.S. 212, 216, 67 S.Ct. 752, 755, 91 L.Ed. 849 (1947), something more is required to upset a verdict than the conclusory language with respect to "taint" used by the district judge. While we must guard against usurping the trial court's prerogative with respect to seriously erroneous jury verdicts, we must be equally diligent in protecting the jury's function. Direction of a new trial on an issue determined by a jury without the articulation of a sufficient basis for such action effects, as Chief Judge Biggs said in the Lind case, supra, 278 F.2d at 90, "a denigration of the jury system and to the extent that new trials are granted the judge takes over, if he does not usurp, the prime function of the jury as the trier of the facts."
 
 
 42
 Plaintiff contends that a new trial with respect to damages was required in any event because of an error in the charge. This was that the court did not instruct the jury to determine the discount rate based on comparing interest rates with inflation, as is allegedly required by Doca v. Marina Mercante Nicaraguense, S.A., 634 F.2d 30 (2 Cir.1980), cert. denied, 451 U.S. 971, 101 S.Ct. 2049, 68 L.Ed.2d 351 (1981), and Jones & Laughlin Steel Corp. v. Pfeifer, --- U.S. ----, 103 S.Ct. 2541, 76 L.Ed.2d 768 (1983). However, as both these decisions make clear, Doca, 634 F.2d at 34, Jones & Laughlin, 103 S.Ct. at 2556, below-market discount rates (currently those which are the products of comparing interest rates with inflation) are appropriate only when the calculation of future wages has not made an upward adjustment for inflation.[6] Here defendant's expert had made an allowance for inflation with respect to Crane's future earnings, estimating, e.g., that Crane would be receiving a salary of $93,000 a year in 2005. Indeed, plaintiff's hypothetical adjustment of Dr. Staller's analysis, which was presented to and considered by the jury, was based on annual wage increases exceeding those which yielded the inflated $93,000 figure. Thus, the evidence of lost future earnings presented to the jury, under either the plaintiff's or defendant's model, may be seen as taking inflation into account.[7] Under these circumstances, we do not find reversible error in the court's instruction.
 
 
 43
 The judgment is therefore reversed, with directions to enter judgment in the amount of $425,000 determined to be plaintiff's damages by the jury at the first trial, with no deduction to be made for any fault of Crane's. No costs.
 
 
 
 [1]
 Fouling the tracks means the placing of personnel or equipment at or near the tracks which might create a hazardous obstruction
 
 
 [2]
 Safety Rule 3207 states that the use of noisy machinery may require additional gang watchmen. Rule 3208 provides that additional warning may be needed around noisy machinery. No additional watchmen or warnings were provided by Conway, even though the work involved use of a chain saw
 
 
 [3]
 On seeing that the men were not clearing the platform, LeClerc started running to them blowing the airhorn, which he also waved over his head in an unsuccessful effort to warn the engineer. The engineer testified that if he had applied his brakes when he first saw LeClerc, the train would have stopped 500 feet before it reached the work crew. It was only when he passed LeClerc that he put on his brakes and started blowing his whistle; the latter had no effect, the whistle apparently also being drowned out by the noise of the chain saw
 
 
 [4]
 
 Damages
 1. What amount do you award the plaintiff to
 compensate for all financial losses suffered
 from the date of Mr. Crane's death to the
 present?
 $43,300.00
 2. What amount do you award the plaintiff to
 compensate for future losses, that is, from
 today to some time in the future, based upon
 what you find would have been Mr. Crane's
 life expectancy, and discounted to its present
 value?
 $381,700.00
 3. Subtract from the total amount of damages
 set forth above the amount of money which is
 equal to the percentage of Mr. Crane's
 contributory negligence, if any, and set forth in
 the final award.
 Total Damages ...... $425,000.00
 Subtracted by....... $212,500.00
 FINAL AWARD ........ $212,500.00
 
 
 [5]
 There is a surprising dearth of authority, both under the FELA and generally, concerning the standards governing the determination of how much of the total negligence should be attributed to each negligent party. See Prosser, The Law of Torts Sec. 67, at 437-38 (4th ed. 1971); V. Schwartz, Comparative Negligence Sec. 17.1, at 276-77 (1974); Philbrick, Loss Apportionment in Negligence Cases (pt. 2), 99 U.Pa.L.Rev. 766, 801-06 (1951); Prosser, Comparative Negligence, 51 Mich.L.Rev. 465 (1953). See also Uniform Comparative Fault Act Sec. 2 & comment (1977), 12 U.L.A. 38-40 (Supp.1983). Much leeway is left to the trier of the facts
 
 
 [6]
 The court suggested use of the 2% discount figure sanctioned by Doca to the relatively small amounts representing the loss of services Crane would have performed for his family and for nurture of his son. In fact, as the judge observed, plaintiff had presented no evidence as to the amounts of these items, and thus the jury was at sea with respect to calculating an appropriate discount. Under these circumstances, we find no fault with the court's suggestion
 
 
 [7]
 Plaintiff also contends that the court's instruction allowed the jury to reach a mischievous result if it based the award on non-inflated future earnings and then used a high discount rate which did not account for inflation. The court concluded that the testimony and evidence at trial adequately informed the jury that inflation should be taken into account if it chose to make an independent calculation of future earnings. App. at 716d. Although we do not necessarily share the district judge's confidence that jurors should be presumed capable of extracting proper methods of discount rate calculations from the testimony and evidence at trial, we nevertheless conclude that the judge's later suggestion that the jury use the 2% below-market discount rate if it decided to venture beyond the figures presented by the parties sufficiently ensured that the jury's determination followed accepted practices