R. P. DUGAS, Plaintiff-Appellee,

v.

The KANSAS CITY SOUTHERN RAILWAY LINES et al., Defendants-Appellants.

No. 72-2338.

United States Court of Appeals,
Fifth Circuit.

Feb. 2, 1973.

Rehearing and Rehearing En Banc
Denied March 27, 1973.

Bryan J. McGinnis, Beaumont, Tex., for defendants-appellants.

Nick C. Nichols, Houston, Tex., Gordon R. Pate, Beaumont, Tex., W. James Kronzer, Houston, Tex., for plaintiff-appellee.

Gay C. Brinson, Jr., Houston, Tex., for Missouri-Kansas.

Before WISDOM, BELL and COLEMAN, Circuit Judges.

COLEMAN, Circuit Judge:

The appellant, R. P. Dugas, was working for Kansas City Southern Railway Company (KCS) as a car cleaner when a boxcar door fell, shattering his left hip, fracturing his right pelvis, and causing the loss of several pints of blood. He brought suit under the Federal Employers' Liability Act, 45 U.S.C., § 51. The jury awarded damages in the sum of $200,000. The railroad appeals.

The judgment of the District Court will be affirmed as to liability but reversed and remanded for a new trial on the issue of damages.

Dugas alleged that there were imperfections in the door which caused it to fall off and which could have been discovered upon proper inspection by the railroad. He also invoked the doctrine of res ipsa loquitur.

On appeal, the railroad asserts that (1) the doctrine of res ipsa loquitur did not apply, (2) the trial court erred in its instruction on damages, and (3) the verdict is excessive.

Dugas' primary job with the railroad was to clean out boxcars in the KCS yard at Port Arthur, Texas. After empty cars come into the yard, they are channeled to the "cleaning track". Crews of two or four men open the boxcar doors, sweep out any debris, and wash the interior with a high pressure hose. The usual procedure is first to open the doors on all the cars to be washed and then to begin the cleaning process. The cars are not usually safety checked until they have been cleaned.

On the morning of May 25, 1970, Dugas and his co-worker, Willie Lockridge, had opened four or five cars before reaching the boxcar which caused this litigation. They opened the door on one side of the car and went around to the other side to open the other door. Dugas testified that Lockridge pried the door open with a small crowbar. Then they both pushed it open wider. Dugas stated that when the door was about

halfway open *it fell off the car and onto him*.

Lockridge testified that if a side sill (a horizontal support bar on the bottom of the car) had been broken, he would have noticed it, and there was none broken. He also stated that he and Dugas shoved the door hard against the door stop and that it fell off only after it had hit the door stop.

Within five minutes of the accident, F. C. Arnold, Jr., a car foreman for the KCS with thirty-two years experience as a car repairman and car foreman, inspected the boxcar. He inspected the car door roller tracks and did not find any breaks or loose welds in them, nor did he find any breaks of the side sills. He said that the car cleaners would not have found anything wrong with the door if they had inspected it. Mr. Arnold further testified that if the opening door had been shoved hard against the door stops, it could cause the door to bounce off its tracks. He said that the boxcar in question "might have" received a customary walking inspection when it first entered the yard.

Subsequent to the accident, the car carried a load of drums to the Texas Company Terminal and then was sent to the KATY repair shop in Denison, Texas. M. E. Wilkinson, a car repairman with KATY Railroad, testified that the boxcar had several broken metal support braces underneath the car, including a cracked side sill. He stated that a broken side sill will cause vibrations when the car is running. These vibrations may cause a spot weld on the door's lower track to break and drop down. Mr. Wilkinson stated that such structural defects might have caused the door to fall off. Neither Mr. Wilkinson's testimony nor the repair order card of the car showed any defect in the top track of the car's door.

J. H. Weis, a former car inspector for KCS who testified for Dugas, stated under cross-examination that this particular type of boxcar was one where the doors are attached to the top track and they did not slide on the bottom rails. All of the weight of the door is on the top, and the bottom is just a groove to guide the door when it opens and closes. But Mr. Weis did say that if the bottom track had dropped down, even slightly, then the door might slide out from the top track.

## RES IPSA LOQUITUR

The railroad contends, for several reasons, that the doctrine of res ipsa loquitur was incorrectly applied in this case.

■ Ordinarily, there are three prerequisites to the application of the doctrine: (1) the accident must be of a kind which ordinarily would not occur in the absence of negligence on the part of someone; (2) the injury must be caused by an agency or instrumentality within the exclusive control of the defendant; and (3) the occurrence must not have been due to any voluntary action on the part of the plaintiff, Furness, Withy & Company v. Carter, 9 Cir., 1960, 281 F. 2d 264; Atchison, T. & S. F. Ry. Company v. Simmons, 10 Cir., 1946, 153 F.2d 206.

In Jesionowski v. Boston & Maine Railroad Company, 329 U.S. 452, 67 S. Ct. 401, 91 L.Ed. 416 (1946), the Supreme Court had occasion to consider the application of res ipsa to FELA cases, particularly the "exclusive control" features of that doctrine.

In that case a brakeman, while in the process of switching cars, was killed when a car was derailed, throwing him to his death. The Court of Appeals for the First Circuit had held that res ipsa loquitur could not be invoked in an extraordinary accident growing out of a set of circumstances which included activity of the injured person. Evidence on behalf of the railroad was sufficient to authorize, but not compel, a jury finding that the derailment was caused by the negligence of the deceased in handling the switch. There was other evidence from which a jury could have found that the derailment was caused by a defect in a frog operated with a spring mechanism. This was disputed

by evidence to the effect that the frog and switch were in good condition both before and after the derailment.

Subsequent to a discussion of the general principles applicable to the use of res ipsa, the Supreme Court held that the rule as applied by the First Circuit " * * * would bar juries from drawing an inference of negligence on account of unusual accidents in all operations where the injured person had himself participated in the operations, even though it was proved that his operations of the things under his control did not cause the accident. This viewpoint duly restricts the power of juries to decide questions of fact, and in this case the jury's right to draw inferences from evidence and the sufficiency of that evidence to support a verdict are Federal questions. A conceptualistic interpretation of res ipsa loquitur has never been used by this Court to reduce the jury's power to draw inferences from facts. Such an interpretation unduly narrows the doctrine as this Court has applied it." The judgment of the First Circuit was reversed.

■ The railroad argues that by opening the boxcar door Dugas was at least in partial control of the instrumentality whence came the injuries, thus defeating the application of the res ipsa doctrine.

We are of the opinion that the teachings of *Jesionowski* mandate the rejection of this argument.

■ Moreover, it is the settled law of this Circuit that res ipsa loquitur is proper even though the plaintiff attempts to prove exactly what happened, Texas & Pacific Railway Company v. Buckles, 5 Cir., 1956, 232 F.2d 257, cert. denied 351 U.S. 984, 76 S.Ct. 1052, 100 L.Ed. 1498; Kansas City Southern Railway Company v. Justis, 5 Cir., 1956, 232 F.2d 267, cert. denied 352 U.S. 833, 77 S.Ct. 49, 1 L.Ed.2d 53.

■ Since the doctrine of res ipsa loquitur is a rule of evidence it is not necessary that it be referred to in the pleadings, Fassbinder v. Pennsylvania Railroad Company, 3 Cir., 1963, 322 F.2d 859; Ramsouer v. Midland Valley Railroad Company, 8 Cir., 1943, 135 F.2d 101.

■ As pointed out in *Jesionowski, supra,* the Act creates federal rights protected by federal rather than state law, Bailey v. Central Vermont Railroad, 319 U.S. 350, 63 S.Ct. 1062, 87 L.Ed. 1444 (1943).

The next attack is aimed at the trial instructions on res ipsa.

Those instructions (which we have paragraphed for clarity) were as. follows:

"Further, the Court would instruct you that in regard to the doctrine of res ipsa loquitur, the mere fact that an accident happened, standing alone, does not, unless otherwise expressly stated, permit the jury to draw the inference that the accident was caused by anyone's negligence.

"However, there is an exception to this general rule known as the doctrine of res ipsa loquitur.

"In addition to plaintiff's specific charges of negligence against the defendant, R. P. Dugas is also relying here upon the doctrine of res ipsa loquitur, which is a Latin term meaning that the thing or occurrence speaks for itself.

"Res ipsa loquitur means that the facts of the occurrence may warrant an inference of negligence, not that they compel such an inference, but they furnish evidence of negligence where direct evidence may be lacking.

"But, it is evidence to be weighed, not necessarily to be accepted as sufficient, which may call for explanations or rebuttal, not necessarily that it requires such explanation or rebuttal. When a thing which causes injury which is under the control of the defendant and an accident as such as in the ordinary course of things does not occur if the one being in control uses proper care, it affords reasonable evi-

dence in the absence of a reasonable explanation that the injury arose from the defendant's want of care.

"Therefore, the Court would instruct you if you find from a preponderance of the evidence that the thing which caused the injury, which in this case was the door which was under the control of the defendant, and an accident as such as in the ordinary course of things does not occur if the one being in control uses proper care, and you further find from a preponderance of the evidence that the door was a contributing cause of the injury, then you will find for the plaintiff under the doctrine of res ipsa loquitur."

The problem with the instruction is to be found in the language of the last paragraph, wherein the trial court told the jury that the door was under the control of the defendant, rather than leaving that as an issue of fact for the decision of the jury. The railroad says that this amounted to a directed verdict for the plaintiff.

On its face, this is not an unreasonable contention.

It is not disputed that the door caused the injury. It can hardly be disputed that this was such an accident "as in the ordinary course of things does not occur with the use of due care". Then, at first glance, it would appear that if the railroad as a matter of law was in control of the door the circle was closed and the jury would have no alternative but to find for the plaintiff.

We, however, do not find the matter to be quite so simple.

Obviously, the railroad was in control of the boxcar and it was being cleaned at railroad direction. Nobody contends that Dugas had any control over its condition. We see no evidence in the record that there was any defect in the door *itself*. Any defective condition which may have existed was in the car, affecting the stability of the rails, roller tracks or other equipment by which the door should have adhered to the car in-

stead of falling off. We think that reasonable men could not have disagreed that these factors were indeed exclusively within the control of the employer, not the employee.

Of controlling significance is the fact that when this instruction was given, counsel for the railroad did not construe its impact as he would now have us to construe it, at the appellate level. He did not object to the instruction on the ground that it amounted to a directed verdict. He objected to the giving of any res ipsa instruction *at all*, arguing before the jury retired, Rule 51, Federal Rules of Civil Procedure, that "res ipsa was not a proper submission." He did not call the attention of the Court to the possibility that the terminology as to the control of the door was incorrect or misleading or both.

We, therefore, decline in the circumstances of this case to reverse on alleged error not presented to the trial court, Dennis v. Central Steamship Corporation, 5 Cir., 1972, 453 F.2d 137, 141.

It follows that the judgment as to liability must be affirmed.

We now proceed to a consideration of another phase of the instructions, dealing with the calculation of damages, to which the appellant did appropriately object, and which, in our opinion, necessitates remand for a new trial solely on the quantum of damages.

In Chesapeake & Ohio Railroad Company v. Carnahan, 241 U.S. 241, 36 S.Ct. 594, 60 L.Ed. 979 (1916), the Supreme Court approved an instruction which advised the jury in an FELA case for personal injuries that in assessing damages it might take into consideration "the pain and suffering of the plaintiff, his mental anguish, the bodily injury sustained by him, his pecuniary loss, his loss of power and capacity for work and its effect upon his future". Numerous reported cases follow this decision and these standards.

We have already pointed out that the Act creates federal rights protected by federal law and that as to the

propriety of jury instructions federal decisions are controlling.

In Grunenthal v. Long Island Railroad Company, 2 Cir., 1968, 388 F.2d 480, 484, reversed on other grounds, 393 U.S. 156, 89 S.Ct. 331, 21 L.Ed.2d 309 (1968), the Second Circuit held:

"The instructions to the jury properly allowed a recovery for the loss of past earnings, the loss of future earnings, pain and suffering and inconvenience *including* (emphasis added) 'the effect of his injuries upon the normal pursuits and pleasures of life'."

We think the foregoing language is significant; the effect of injuries upon the normal pursuits and pleasures of life is an included item, not a separate one, that is, the normal pursuits and pleasures of life are to be included as a part of pain, suffering, and inconvenience. It is not a factor to be separately measured as an independent ground for damages.

While we have found no federal case, and we have been cited none, on the subject of "loss of vitality" we are equally certain that this item is an included element of the consequences of physical injury, not separately to be measured independently of the basic premise.

When the charge was completed, the railroad objected, as follows:

"[I]n the charge where the Court charged that in the elements of damages recovery could be had on mental anguish and for loss of enjoyment of life and then recovery for physical impairment and loss of vitality, I think really they are one and the same, but the way the charge was given it sounds like there are a total of four elements involved, mental anguish, loss of enjoyment of life, physical impairment and loss of vitality, there are four separate elements of damage. Really mental anguish and loss of enjoyment is one thing and I believe the proper instruction on mental anguish, pain and suffering and on the other hand, physical impairment and those

would be confusing and indicated additional grounds for recovery, that the law doesn't provide for."

Counsel for plaintiff responded that his requested instructions did "combine mental anguish construction" and that there would be no confusion "that the two are related". He further pointed out that the Court had said the jury was "to reach a result on these elements of damages so that there will be no duplication of damages of any one item".

He added, however, that if there was any doubt about it possibly the Court would prefer to clarify it. The Court thought that he had touched base, as counsel had indicated, and declined to say anything further.

We now examine what the record shows to have actually been said to the jury. The elements of damage were submitted to the jury in the following language, adding emphasis to the use of the word "and":

"Such physical pain, mental anguish *and* loss of enjoyment of life as the plaintiff has sustained from the date of occurrence until the date of trial, such physical pain *and* mental anguish *and* loss of enjoyment of life as plaintiff may in reasonable probability sustain in the future beyond this date, such loss of earning power, physical impairment, *and* loss of vitality as plaintiff has sustained from the date of the occurrence until the date of the trial; such loss of earning power, physical impairment, *and* loss of vitality as plaintiff will in reasonable probability sustain in the future beyond this date."

The Court wound up with the following language:

"Further, you are instructed in considering the plaintiff's injuries and damages that you may also take into account physical impairment *and* loss of vitality as indicated herein. For example, you may consider the value of such physical impairment, the loss of vitality as you may find associated with plaintiff's condition which you

have not already considered in your evaluation for Mr. Dugas' pain or mental anguish, past or future, to the end that the dollars and cents you find for plaintiff's physical impairment *and* loss of vitality should not constitute a double recovery for other damages you have already considered."

■ Despite the reluctance naturally experienced in the act of setting aside the quantum of damages awarded a badly injured, unemployed man, who can follow no occupation but that of a common laborer, this Court is compelled to do it for it clearly appears that the cited instructions repeatedly asserted "loss of enjoyment of life" and "loss of vitality" as if they were separate and independent, rather than includible, items of damages, or, at the very least, they were couched in terms which could have confused the jury as to the correct standards it had a duty to apply in this regard. And this is true despite the warning at the close of the instructions, which mentioned duplication only in connection with "loss of vitality".

■ The defendant must pay damages, but it is entitled to have a jury measure those damages according to clear, legally correct, plainly enunciated standards, an obligation which the trial court no doubt intended but did not accomplish.

## EXCESSIVENESS OF THE VERDICT

Appellants maintain that the $200,000 verdict is excessive and is the result of jury prejudice or confusion. The trial court overruled a motion for a new trial and request for a remittitur.

Since we have concluded that the case must be remanded for a new trial on the issue of damages alone, it ordinarily would not be necessary for us to consider the assignment that the jury awarded excessive damages. Since, however, that is the very issue which must be tried anew we feel that we should discuss that subject.

Appellant's injuries required extensive medical treatment. He did not undergo surgery until the day after the accident because his physician felt that he could not withstand its rigors on the same day of the injury. His feet were placed in traction so the injured bone fragments could be pulled into place. After the fragments were positioned as best as they could be, a metal nail three and a quarter inches long with an attached metal plate was placed in the leg to connect the shattered bone fragments. This metal appliance remains in the leg and probably will not be removed unless irritation develops.

It was estimated that Dugas lost approximately six pints of blood before and during surgery. Anemia developed from the high loss of blood and transfusions were required. Subsequent hospitalization and a myelogram disclosed a ruptured disc. In the future the ruptured disc may require a laminectomy and/or spinal fusion.

Dr. Walter Glass, the orthopedic surgeon who treated Dugas, testified that:

" * * * he has shortening of the leg, he has some restriction of motion in the hip joint due to scar tissue formation about the hip, he has the internal fixation plate and screws and Jewett appliance still in there. In other words, he is nowhere near the same condition that he was prior to the injury."

Some twenty months after the accident, appellee was still experiencing pain in his back and leg. Dr. Glass also stated that appellee was at least fifty per cent permanently disabled.

At the time of the injury Dugas was forty-two years old, with a fourth grade education and had no other formal schooling. He was trained for nothing except manual labor. He has been unsuccessful since the accident in obtaining employment.

■ On the authority of Grunenthal v. Long Island Railroad Company, *supra*, we judge the damage award not to have been excessive.

## CONCLUSION

The judgment of the District Court on the issue of liability is affirmed,

The judgment as to the quantum of damages is reversed and remanded for a new trial solely on that issue.

Each party will bear his or its own costs.

WISDOM, Circuit Judge (dissenting):

I respectfully dissent.

The boxcar door did not happen to fall on Dugas as he was passing by. It fell off when he opened the door. Dugas opened the door by banging it against the doorstop. In these circumstances, the jury should be permitted to decide whether the door was in the control of Dugas, for purposes of applying or not applying the res ipsa loquitur doctrine. In effect, the trial judge took over the jury's prerogative to decide the issue of control and directed a verdict on the application of res ipsa to this case.

I would reverse for a new trial.

I concur in the Court's holding that the trial judge's instructions on damages "could have confused the jury as to the correct standards it had to apply."