**James C. EARL,**
**Plaintiff–Appellee/Cross–Appellant,**

v.

**BOUCHARD TRANSPORTATION CO., INC., and Tug Marion C. Bouchard Corp., Defendants–Appellants/Cross–Appellees.**

**Nos. 33, 93, Dockets 90–7234, 90–7256.**

United States Court of Appeals, Second Circuit.

Argued Aug. 27, 1990.

Decided Nov. 2, 1990.

---

Paul C. Matthews, New York City, for plaintiff-appellee/cross-appellant.

Mark F. Muller, Freehill, Hogan & Mohar, New York City, for defendants-appellants/cross-appellees.

Before FEINBERG and
CARDAMONE, Circuit Judges, and
CABRANES, District Judge.*

JOSÉ A. CABRANES, District Judge:

In broad terms, this case presents six primary questions. First, did the district court's charge to the jury regarding contributory negligence constitute reversible error? Second, was it error for the district court to charge the jury that plaintiff could recover for pain and suffering *and* loss of life's pleasures? Third, did the district court abuse its discretion in not unconditionally ordering a new trial? Fourth, did the district court use an improper method of determining the remittitur or abuse its discretion by remitting the amount that it did? Fifth, after agreeing to the remittitur, may plaintiff now challenge it on cross-appeal? And finally, was it error for the district court, when calculating the total damage award and after subtracting the remittitur, to add an award for a claim of damages that had been previously dismissed?

## BACKGROUND

The facts of this case are for the most part undisputed. Plaintiff was a tugboat deckhand employed by defendants. He brought a personal injury action under the Jones Act, 46 U.S.C.App. § 688, against defendants for two separate accidents. The first was an elbow injury that occurred on August 29, 1984 for which he received a $5,000 jury award that is not in dispute.

The second and more serious injury occurred on December 13, 1984. On that date, defendants' tugboat, the *Marion C. Bouchard,* was tied to a dock in the East River by a single mooring line. The mooring line was about six inches in circumference and quite heavy. At one end was a loop which fit over a bollard located about eight feet from the stringpiece.[1] The deck of the tugboat was approximately six feet below the level of the stringpiece.

Although the task of casting off the mooring line is easily managed by two deckhands—one casting the loop off the bollard, the other hauling in the line—it can be difficult for just one deckhand. On the day of the accident, plaintiff received orders to cast off. Without any assistance from a second deckhand, plaintiff stepped up onto the bulwark and imparted a whip-like motion to the mooring line in an effort to remove it from the bollard. In the course of doing this, plaintiff lost his balance, fell from the bulwark, and landed with his right foot on a different line, severely spraining his ankle and aggravating his elbow injury.

Plaintiff was 61 years old at the time of both accidents. He maintains that, as a consequence of his injuries, he was forced to retire on May 16, 1985, approximately one month before turning 62. He claims damages for, *inter alia,* loss of future earnings on the grounds that, absent these injuries, he would have continued to work at least an additional three years and five weeks—that is, until his 65th birthday.

■ Following a three-day trial, a jury returned a verdict for plaintiff in the amount of $855,000 for the ankle injury—comprising $425,000 for special damages (*i.e.,* lost earnings) and $430,000 for general damages (*i.e.,* nonpecuniary losses). Defendants moved for a new trial or, in the alternative, a remittitur. Judge Weinstein denied defendants' motion for a new trial on the condition that plaintiff accept a remittitur with respect to the ankle injury to $525,000. In his Memorandum and Order of April 24, 1990, 735 F.Supp. 1167, Judge Weinstein divided the $525,000 into $105,000 for special damages, $380,000 for gen-

---

* The Honorable José A. Cabranes, United States District Judge for the District of Connecticut, sitting by designation.

1. A "bollard" is a post on a dock "around which mooring lines are thrown." *Webster's Third New International Dictionary* 248 (1976). The "stringpiece" is the heavy squared timber lying along the top of the piles forming a dock front. *Id.* at 2263.

eral damages, and $40,000 for pre-judgment interest and "maintenance and cure."[2]

Defendants now appeal from the denial of their motion for a new trial. They argue that Judge Weinstein committed "fundamental error" in his charge to the jury regarding contributory negligence and reversible error in his charge regarding pain and suffering and loss of life's pleasures. Defendants argue further that a new trial should be granted because the jury's verdict was the result of passion or prejudice and because Judge Weinstein abused his discretion by not unconditionally granting defendants' motion for a new trial. In the alternative, defendants ask this court substantially to increase the remittitur on the grounds that the district court employed an incorrect standard in calculating the remittitur and abused its discretion by not reducing the award further. Finally, defendants contend that the district court miscalculated the remittitur inasmuch as it factored back into the award an unspecified amount for maintenance and cure to reduce the amount of the remittitur after having dismissed the maintenance and cure claim during trial. Plaintiff cross-appeals, claiming that the district court abused its discretion by ordering too drastic a remittitur of the special damages award.

We affirm Judge Weinstein's decision not to grant unconditionally a new trial and all elements of his judgment except that portion relating to maintenance and cure, which we reverse and remand to the district court with instructions to excise that portion from the judgment.

**2.** Under general maritime law, a shipowner has a duty to provide "maintenance and cure" to seamen who fall ill or are injured while in the service of the ship. That ancient duty "derives from the 'unique hazards [which] attend the work of seamen,' and fosters the 'combined object of encouraging marine commerce and assuring the well-being of seamen.' ... [T]he breadth and inclusiveness of the shipowner's duty assure its easy and ready administration for '[i]t has few exceptions or conditions to stir contentions, cause delays, and invite litigations.'" *Vella v. Ford Motor Co.*, 421 U.S. 1, 3–4, 95 S.Ct. 1381, 1382–83, 43 L.Ed.2d 682 (1975)

## DISCUSSION

### I.

#### A.

■ In the course of his instructions to the jury on the issue of contributory negligence, Judge Weinstein stated that

[i]f you find that the plaintiff was injured because he was following the orders of his superiors, the captain, then you cannot find that there was any contributory negligence. That's true even if the plaintiff knew that the activity which he was ordered to do was dangerous. As a seam[a]n he had the obligation to follow orders. (Joint Appendix ["JA"] at 422)

According to defendants, Judge Weinstein's instruction constitutes "fundamental error" inasmuch as the phrase "following the orders of his superiors" was not sufficiently specific and, hence, too easily misconstrued. Defendants contend that plaintiff was ordered simply to cast off the mooring line and not, more specifically, to stand on the bulwark. In defendants' view, plaintiff opted to stand on the bulwark—an act that is itself prohibited—by his own choice and independent of any order. Accordingly, defendants maintain that plaintiff was contributorily negligent, notwithstanding the fact that plaintiff *was*, in a general sense, following the orders of his superiors.

■ Defendants' argument fails for at least two reasons. First, defendants never objected to this instruction at trial and consequently have no sufficient grounds for appealing that instruction. In general, a party may not raise on appeal an asserted

(quoting from *Aguilar v. Standard Oil Co.*, 318 U.S. 724, 727, 63 S.Ct. 930, 932, 87 L.Ed. 1107 (1943); *Farrell v. United States*, 336 U.S. 511, 516, 69 S.Ct. 707, 709, 93 L.Ed. 850 (1949)); *see also Incandela v. American Dredging Co.*, 659 F.2d 11, 13–14 (2d Cir.1981); G. Gilmore & C. Black, *The Law of Admiralty* 281–96 (2d ed. 1975).

Judge Weinstein had dismissed the maintenance and cure claim on November 1, 1989 (during the trial), because of plaintiff's failure to meet a requirement of submitting a "non-fit for duty certificate."

error in the giving or failure to give a particular instruction to the jury unless he has made timely objection in the trial court. Fed.R.Civ.P. 51;[3] *Air et Chaleur, S.A. v. Janeway*, 757 F.2d 489, 493 (2d Cir.1985). An exception may be made only when there is "plain error"—that is, where the error may result in a miscarriage of justice or in obvious instances of misapplied law. *Id.* at 494; *see also Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 256, 101 S.Ct. 2748, 2754, 69 L.Ed.2d 616 (1981) (stating exception to "plain error" rule for areas of law that are in "a state of evolving definition and uncertainty").

We find no error in Judge Weinstein instructions, much less "plain error." The instruction on contributory negligence was clearly in accord with the law of this circuit. Indeed, in *Darlington v. National Bulk Carriers Inc.*, 157 F.2d 817 (2d Cir. 1946), Judge Frank, writing for a unanimous panel that included Judges Swan and Learned Hand, reversed a defendant's verdict, because the district court had refused to give this substantially similar charge:

> The plaintiff was bound to obey the orders of his superiors on board the vessel. The chief officer was the plaintiff's superior and plaintiff was bound to obey the orders of the chief officer. Even though the orders of the chief officer required him to work with unsafe tools or under unsafe conditions, the plaintiff was obliged to obey the orders and did not assume any risk of obedience to orders.

*Id.* at 819. It cannot have been plain error for Judge Weinstein to give an instruction that is so similar to the instruction that the district court in *Darlington* was reversed for failing to give.

But even assuming for the argument that defendants' counsel had properly and timely objected, the jury instruction was not faulty. The jury was informed that the question of whether plaintiff was following a specific order to stand on the bulwark, or whether he was following only a more general order to cast off, was a disputed issue of fact. Indeed, in his charge to the jury, Judge Weinstein carefully explained that is was

> [t]he defendant[s'] contention ... that the plaintiff's actions leading to his fall were not taken pursuant to orders or company practice. Instead, the defendant[s] claim[ ] that they were taken solely due to the plaintiff's own negligence.
>
> Particularly, it's the defendant[s'] contention that the plaintiff was ordered not to stand on the bulwark when doing this kind of work. (JA at 415)

Thus, the jury was clearly informed of defendants' position that plaintiff was injured because he was actually *disobeying* orders not to stand on the bulwark. Likewise, Judge Weinstein explained plaintiff's contention that "he was ordered to cast off a mooring line from the dock by himself and he was ordered to stand on the bulwark."[4] Through those instructions, the jury could fully understand the factual dispute between plaintiff and defendants over whether plaintiff was following or disobeying orders by standing on the bulwark. Taken in context, then, the jury instruction clearly satisfies the concerns raised on appeal by defendants' counsel. Contrary to defendants' claim on appeal, the fact that the jury found no contributory negligence does not imply that the charge *"forbade* the jury from finding contributory negligence under any theory of the case." The district court provided a general contributory negligence charge and included a question about contributory negligence on

---

**3.** Rule 51 of the Federal Rules of Civil Procedure provides, in pertinent part, that "[n]o party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection."

**4.** Referring specifically to this part of the record, defendants' counsel insists that "fundamental error was committed when the jury was instructed that Earl 'was ordered to stand on the bulwark.'" But the record reveals that the jury was never so instructed. Instead, as described above, the district court reviewed for the jury the factual contentions of both the plaintiff and the defendants, and where, as here, they were inconsistent, the jury was left to choose the version that it considered to be the most credible.

its verdict form. Thus, it cannot seriously be maintained that Judge Weinstein "forbade" a finding of contributory negligence. The fact that the jury found that the "[p]ercentage of negligence ... attributable to the plaintiff" was zero (JA at 471) implies only that the jury found plaintiff's contention credible—notwithstanding defendants' contention to the contrary—that plaintiff was injured because "he was following the order of his superiors."

### B.

Defendants contend that the district court committed reversible error, because, over the defendants' objections, the district court provided jury instructions that deviated from model federal jury instructions which provide, in pertinent part, that "[u]nder the Jones Act ... the plaintiff, if he has sustained his burden of proof, may recover for ... [p]ain, suffering and mental anguish, *including* the effect of his injury on the normal pursuits and pleasures of life...." 4 L. Sand, J. Siffert, S. Reiss, J. Sexton & J. Thrope, *Modern Federal Jury Instructions* ¶ 90.04, at 90–52 (1990) (emphasis added). The district court gave the following charge: "Plaintiff is also entitled to recover for past and future ... pain and suffering *and* for loss of enjoyment of his usual activities." According to defendants, the district court's instruction, because it contains the word "and" instead of "including," permitted "the jury to conclude that pain and suffering and loss of life's pleasures are separate items of damages...."[5] Defendants concede, and we agree, that this subtle deviation from the model instructions does not constitute "plain error." Defendants nevertheless maintain that this deviation constitutes reversible error and that the case should be reversed inasmuch as the district court's instruction was given "over the express objection of defendant[s]."

But defendants' argument is not supported by the record. Defendants never actually objected to this aspect of the charge. They never brought to the court's attention the difference in language between the model instructions and the instruction that the court proposed to give and ultimately gave. Indeed, defendants did not ever refer to the model instructions at the charging conferences held by Judge Weinstein much less call the judge's attention to the subtle difference between "and" and "including." What the defendants characterize as an express objection to this instruction was nothing more than a general objection to *any* instruction on the topic of loss of enjoyment. And that objection was properly overruled by Judge Weinstein.

In personal injury actions under state law, we have previously recognized loss of enjoyment of life—"such as inability to play tennis, ski, sail, or fully enjoy home-life activities"—as a compensable element of damages, *O'Gee v. Dobbs Houses, Inc.,* 570 F.2d 1084, 1092 n. 2 (2d Cir.1978) (Feinberg, J., dissenting); *Lebrecht v. Bethlehem Steel Corp.,* 402 F.2d 585, 591–92 (2d Cir.1968). This circuit has yet to address the question of whether, as a matter of federal common law or under the Jones Act, damages for "loss of enjoyment of life" are separate from or "included" in damages for pain and suffering. However, that question need not be reached in this case—indeed, as discussed below, it seems doubtful that that question would ever need to be reached. On the record before us, we find no objection made by defendants' counsel to the separate and simultaneous submission of the terms "loss of life's enjoyment" and "damages for pain and suffering." Defendants' failure to object to the instruction on the separability of the two components is itself sufficient to affirm the district court's decision regarding this issue.[6] As we noted above, a party

---

5. For similar reasons, defendants also object to the following instruction which the district court gave concerning the present value of damages: "[A]s to future pain and suffering *and* loss of enjoyment, any amount awarded now can be invested by the plaintiff and, therefore, the

present[ ] value of *these* future d[a]mages may be less than what *they* would have been if *they* were paid out by defendant periodically." (JA at 474 (emphasis added)).

6. Defendants also maintain that plaintiff's counsel should not have been permitted to suggest

may not raise on appeal an asserted error in the giving or failure to give a particular instruction to the jury unless he or she has made timely objection in the trial court. Fed.R.Civ.P. 51; *Air et Chaleur*, 757 F.2d at 493.[7]

Even if defendants' counsel had properly objected to this instruction such that we felt it necessary to reach the question presented by defendants, we doubt that the issue of whether damages for loss of life's pleasures are part of, or separate from, damages for pain and suffering is a matter of as much consequence as the parties seem to believe. To be sure, other courts, believing this to be an issue of some importance, have addressed it. *See, e.g., Dugas v. Kansas City S. Ry. Lines*, 473 F.2d 821, 827 (5th Cir.1973) (F.E.L.A.), *cert. denied*, 414 U.S. 823, 94 S.Ct. 124, 38 L.Ed.2d 56 (1973); *McDougald v. Garber*, 73 N.Y.2d 246, 536 N.E.2d 372, 538 N.Y.S.2d 937 (1989). Nevertheless, most courts have not addressed it. That is true perhaps because no matter how the issue is decided, and even if it is left undecided, the result should have no effect on awards by a properly instructed jury. A jury does not confront the question of whether loss of life's pleasures is part of, or is separate from, pain and suffering. A jury generally confronts only two questions with regard to damages: (1) What items of damages should be considered when calculating a verdict?; and (2) How should the various items which make up the total award be measured? As noted above, we have previously held in tort actions arising under state law that loss of life's pleasures is a compensable item to be included somewhere in the total damage award. *See, e.g., O'Gee v. Dobbs Houses, Inc.*, 570 F.2d 1084, 1092 n. 2 (2d Cir.1978) (Feinberg, J., dissenting) (collecting cases). We have also indicated that loss of life's pleasures and pain and suffering damages require separate proofs. *See generally Rufino v. U.S.*, 829 F.2d 354, 360 n. 8 (2d Cir.1987) (Federal Tort Claims Act claim). Thus,

during summation specific general damage amounts for both pain and suffering and loss of life's pleasures, because doing so "conditioned the jury into thinking that the same damages could and should be counted twice in computing the general damage award." Without addressing the merits of that claim, it is again enough to point out that the record before us does not support the defendants' contention that they properly objected to this aspect of plaintiff's summation.

7. The law of the Fifth Circuit, to which defendants draw our attention, is not to the contrary. It is true that in *Dugas v. Kansas City S. Ry. Lines*, 473 F.2d 821, 827 (5th Cir.1973) (F.E.L.A.), *cert. denied*, 414 U.S. 823, 94 S.Ct. 124, 38 L.Ed.2d 56 (1973), the Fifth Circuit held that

the effect of injuries upon the normal pursuits and pleasures of life is an included item, not a separate one, that is, the normal pursuits and pleasures of life are to be included as a part of pain, suffering, and inconvenience. It is not a factor to be separately measured as an independent ground for damages.

But in *Dugas*, unlike the present case, the defendant's counsel had objected, making clear to the district court the basis of the objection, *id.*, and preserving his claim for appeal.

However, nine years after *Dugas*, in a Jones Act case much like the present case, the Fifth Circuit upheld a separate submission of the claim for "loss of life's enjoyment" where defendant's counsel had failed to object to the proposed instruction:

[W]e find no objection made by [defendant's] counsel to the separate and simultaneous submission of the issues of loss of life's enjoyment and damages for pain, suffering, and mental anguish. By failing to object, defendant denied the Court below an opportunity more precisely to frame the issues involved. For that reason, we have consistently held that a party who fails to object to the form of special interrogatories and accompanying general instructions cannot complain for the first time on appeal. Because [defendant] failed to object, we need not reach the merits of its claimed duplication of award.

*Wood v. Diamond M. Drilling Co.*, 691 F.2d 1165, 1169 (5th Cir.1982) (citations omitted), *cert. denied*, 460 U.S. 1069, 103 S.Ct. 1523, 75 L.Ed.2d 947 (1983).

Thus, in the Fifth Circuit, a party on appeal in a Jones Act action is prohibited from claiming that jury instructions regarding this issue of damages can constitute grounds for reversible error if that party failed to object properly to those jury instructions before the district court. In other words, in the Fifth Circuit, jury instructions such as those given by Judge Weinstein in this case do not constitute "plain error"—*i.e.*, an error that results in a "miscarriage of justice," and that an appellate court may review on appeal notwithstanding the harmed party's failure to make a timely objection. *Air et Chaleur*, 757 F.2d at 493. No other federal law directly on point has been drawn to our attention and we have found none.

whether we say the damages calculated by a jury for loss of life's pleasures are "included" in the damages calculated for pain and suffering, or whether we say the damages for loss of life's pleasures are "separate from" the damages for pain and suffering, the total damages awarded by the jury should be the same. In either case, the jury is expected to make the same calculations and add the two amounts together to come up with a total award. District courts, therefore, should not be unduly preoccupied with the unimportant distinction between "and" and "including" —that is, the issue of whether or not loss of life's pleasures are "included" in pain and suffering. Instead, district courts should take care to ensure that juries are properly instructed on how each of the various elements of damages should be calculated and that juries are told not to "double count" damages for loss of life's pleasures—by counting them once as separate from, and again as part of, damages for pain and suffering—in arriving at their total damage figure.

Finally, it should be noted that the district court's memorandum and order granting defendants' request for a remittitur and calculating the remittitur contains no finding of any such "double counting."

## II.

■ Defendants contend that the district court's judgment should be reversed because Judge Weinstein abused his discretion by not unconditionally ordering a new trial. First, they claim that "since the verdict was so excessive and was obviously the result of passion or prejudice, Judge Weinstein erred in not unconditionally ordering a new trial." But defendants offer no persuasive evidence that the award was "the result of passion or prejudice" nor do they convince us that the award was "shocking to the 'judicial conscience.'" *Donovan v. Penn Shipping Co.,* 536 F.2d 536, 539 (2d Cir.1976) (Feinberg, J., dissenting), *aff'd per curiam,* 429 U.S. 648, 97 S.Ct. 835, 51 L.Ed.2d 112 (1977). We can find nothing on the record to support defendants' claim. Defendants' counsel him-

self concedes that "it is difficult to put one's finger on the precise mechanism(s) which triggered the jury's passion...." To be sure, as Judge Weinstein noted, the damage award for the injured ankle was "an exceptionally sympathetic verdict for the plaintiff," but the jury's modest $5,000 damage award to plaintiff for his injured elbow belies defendants' unsubstantiated assertion that the jury's "passion was in fact triggered."

■ Additionally, defendants argue that because Judge Weinstein found that plaintiff was guilty of "fraud or other misconduct," the judge abused his discretion in permitting the verdict to stand. That conclusion, however, is without merit inasmuch as the premise is wholly inaccurate. Defendants refer to remarks made by Judge Weinstein in an informal conference where the judge commented in passing that his "own opinion is that [plaintiff is] a malingerer." That hardly constitutes a finding by the judge that the plaintiff was guilty of "fraud or other misconduct." On the contrary, Judge Weinstein wrote a thoughtful and thorough twenty-nine page memorandum and order analyzing the evidence in this case and explaining the rationale for his granting a remittitur. Nowhere does he hint, much less find, that Earl was guilty of fraud or misconduct. Indeed, he observed that "it is apparent that plaintiff's earning capacity—or work capital—was permanently impaired or depleted as a result of his injuries," and that his injuries were "permanently and fully disabling...."

## III.

### A.

■ We turn now to the question of whether the district court employed the proper standard in calculating the remittitur. Defendants contend that notwithstanding Judge Weinstein's reduction of the general damage award from $430,000 to $380,000, the general damages award remains exorbitant. Defendants would prefer a new trial, but, in the alternative, they offer two independent arguments for

why this court should recalculate the general damages remittitur. First, they suggest that, inasmuch as district courts within our circuit have employed different standards for calculating remittiturs, there is "inappropriate" disparity in those remittiturs. Defendants urge us to prevent such disparities by rejecting the standard used by Judge Weinstein and adopting the "correct" standard. Second, defendants argue that the remittitur should be recalculated on appeal because the district court abused its discretion in calculating the remittitur. For the reasons discussed below, we see no sufficient basis for upsetting Judge Weinstein's finding that the jury award exceeded the "total award that could be justified," or the judgment, based on a remittitur, which gave "maximum effect to" an "exceptionally sympathetic verdict for the plaintiff."

██ "Remittitur," as we have observed, "is the process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial." *Shu-Tao Lin v. McDonnell Douglas Corp.*, 742 F.2d 45, 49 (2d Cir.1984). There are two principal objectives to consider when comparing the possible standards for calculating a remittitur. The first is to enable the parties to avoid the delay and expense of a new trial when a jury award is intrinsically excessive. *See, e.g., Donovan,* 536 F.2d at 537–38 (emphasizing judicial economy considerations of remittiturs); *Akermanis v. Sea-Land Serv., Inc.,* 688 F.2d 898, 903 (2d Cir.1982) (same), *cert. denied,* 461 U.S. 927, 103 S.Ct. 2087, 77 L.Ed.2d 298 (1983), *cert. denied,* 464 U.S. 1039, 104 S.Ct. 700, 79 L.Ed.2d 165 (1984); *Lanfranconi v. Tidewater Oil Co.,* 376 F.2d 91, 97 (2d Cir.) (same), *cert. denied,* 389 U.S. 951, 88 S.Ct. 334, 19 L.Ed.2d 361 (1967). The second objective is to minimize the extent of judicial interference with a matter that is otherwise within the jury's domain. *See Akermanis,* 688 F.2d at 902 ("Remittitur is a limited exception to the sanctity of jury fact-finding."); *Donovan,* 536 F.2d at 539 (Feinberg, J., dissenting) (a remittitur is "an invasion of the jury's prerogative and the right of the plaintiff to its determina-

tion, and can be justified only in limited situations").

There are at least three possible rules that district courts have adopted for computing a remittitur. *See generally* 6A *Moore's Federal Practice* ¶ 59.08[7], at 59–192 to –196 (2d ed.1989). *See also Shu-Tao Lin,* 742 F.2d at 49–50 (reviewing these rules but declining to choose among them). The standard that is most intrusive upon jury awards would "reduce the verdict to the lowest amount that could reasonably be found by the jury." 6A *Moore's Federal Practice, supra,* at 59–193. Under this standard, a plaintiff would typically do better by opting for a second trial than he would by accepting the district court's remitted judgment. Thus, this standard not only gives the least weight to the jury's apparent intent to award a generous verdict, but it also encourages plaintiffs to reject the remittitur and opt for a costly second trial. Perhaps not surprisingly, only one published opinion favoring the adoption of the most intrusive standard could be found. *See Meissner v. Papas,* 35 F.Supp. 676 (E.D.Wis.1940).

Some courts have employed the least intrusive standard, holding that the remitted amount should reduce the verdict only to the maximum that would be upheld by the trial court as not excessive. Indeed, this was the standard employed by Judge Weinstein in the present case. The benefits of this standard are significant. Compared to the alternatives, it is the most faithful to the jury's verdict. Moreover, the plaintiff is unlikely under this standard to opt for a second trial. Once the remittitur is calculated, the plaintiff becomes fully informed of the maximum award that the district court would permit any jury to return in that particular case. From the plaintiff's perspective, therefore, the only objective that might be served by opting for another trial would be to obtain a right to an appeal. A plaintiff can appeal a reduced verdict only after he or she has rejected the remittitur and after a second trial is complete. *Donovan,* 536 F.2d at 538 (Feinberg, J., dissenting). But, for two reasons, a plaintiff's incentive to appeal (and, hence, to obtain a second trial) would be weaker

under the least intrusive standard than it would be under the most intrusive standard. First, the remitted award would be largest under the least intrusive standard, so there is less to gain from a successful appeal. Second, an appellate court should be more willing to defer to a district court's remittitur the more the district court's standard for calculating the remittitur was faithful to the jury's apparent intent. "[L]ess appellate deference need be accorded to a ruling of the trial judge which is opposed to the verdict than to a ruling which is in support of it...." *Reinertsen v. George W. Rogers Constr. Corp.*, 519 F.2d 531, 532 (2d Cir.1975). For these reasons, the least intrusive standard, which Judge Weinstein employed, seems clearly superior to the most intrusive standard.

But defendant urges upon us Professor Moore's argument in favor of an "intermediate" standard. The intermediate standard reduces the excessive jury award to what the trial court believes a "properly functioning jury, acting free of suggestions by counsel, would have awarded...." *Uris v. Gurney's Inn Corp.*, 405 F.Supp. 744, 747 (E.D.N.Y.1975) (citing 6A *Moore's Federal Practice, supra*, at 59–196). Professor Moore argues that

> [t]his intermediate position gives the defendant the benefit of the full supervisory power of the trial court, and yet the plaintiff still has his option to refuse to remit. And it moderately serves the function of remittitur aimed at avoiding the judicial waste of a new trial, for the plaintiff still has a strong incentive to remit. If, on the other hand, the trial court fixes the residue at the lowest amount that it would permit a verdict to stand, this constitutes a considerable intrusion upon the jury's function and the plaintiff's incentive in remitting is reduced to a minimum. True, if the court adopts the other extreme position and orders a remittitur of only that amount which exceeds the very maximum of recovery that it would uphold, the plaintiff has a very strong incentive to accept the option of remittitur. But the defendant, who has no option, does not have the benefit of the trial court's seasoned judg-

ment as to an amount that is ample and yet thoroughly fair. The intermediate position effects a fair and practicable adjustment.

6A *Moore's Federal Practice, supra*, at 59–196.

This argument in favor of the "intermediate" standard is not altogether persuasive, despite the surface plausibility of any option that seems to avoid "extreme" positions. First, it is not clear that the plaintiff's "option to refuse to remit" is a particularly valuable option to the plaintiff. By refusing to remit, a plaintiff must undergo the delay and expense of a second trial. Indeed, a plaintiff is not able to appeal the remittitur order that followed the first trial until after the second trial has concluded. *See* Part IV, *infra*. The use of a remittitur therefore has a powerful "coercive effect upon a plaintiff." *Donovan*, 536 F.2d at 539 (Feinberg, J., dissenting); *see also* Note, Remittitur Practice in the Federal Courts, 76 *Colum.L. Rev.* 299, 311–13 (1976).

Professor Moore also expresses concern that a defendant "has no option." It should be remembered, however, that, regardless of whether a plaintiff "elects" the remittitur or "elects" to have a second trial, the plaintiff is made worse off and the defendant is made better off relative to the situation where the jury verdict is permitted to stand. Thus, although it has been said that a defendant in these circumstances "has no option," it does not follow that a defendant is therefore entitled to special consideration. Moreover, the defendant *does* have an option. If the plaintiff accepts the remitted award, the defendant can appeal—as the defendants did in this case. That is an option that the plaintiff does not have. *Donovan v. Penn Shipping Co.*, 429 U.S. 648, 650, 97 S.Ct. 835, 837, 51 L.Ed.2d 112 (1977) (per curiam) ("reaffirm[ing] the longstanding rule that a plaintiff in federal court, whether prosecuting a state or federal cause of action, may not appeal from a remittitur order he has accepted"); *see also* Part IV, *infra*.

Professor Moore argues further that under the least intrusive standard the "defen-

**1330**

dant ... does not have the benefit of the trial court's seasoned judgment as to an amount that is ample and yet thoroughly fair. The intermediate position effects a fair and practicable judgment." But that conclusion begs the question. To obtain a "fair" judgment on damages in a case such as this, the law has traditionally deferred to the decision of a jury of laymen drawn from the community at large, and not to the "seasoned judgment" of the trial judge. *Cf. Dagnello v. Long Island R.R. Co.,* 193 F.Supp. 552, 553 (S.D.N.Y.1960) (Weinfeld, J.) ("The primary responsibility for the assessment of damages rests upon the jury, which is allowed a wide area of discretion.... Even were the Court to disagree with the amount of the award, it would not be justified in substituting its judgment for that of the combined experience of twelve jurors unless it 'conscientiously [believed] that the jury has exceeded the bounds of propriety.'" (citation omitted)), *aff'd on other grounds,* 289 F.2d 797 (2d Cir.1961). And because the least intrusive standard for calculating a remittitur is—for the reasons discussed above—relatively unlikely to lead to a second trial, it would seem to be the most "practicable" standard.

In sum, we are not persuaded by the argument that the "intermediate" standard favored by Professor Moore should have been employed in computing the remittitur in this case. Indeed, for the reasons stated above, we hold that district courts should use the least intrusive standard for calculating a remittitur. According to that standard, a district court should remit the jury's award only to the maximum amount that would be upheld by the district court as not excessive.

### B.

■ We find nothing in the record to substantiate the claim that Judge Weinstein abused his discretion by remitting the amount that he did.[8] *See generally Reinertsen,* 519 F.2d at 532–33 (court of appeals should not disturb remittitur unless "the quantum of damages found by the jury

was *clearly* within ... 'the maximum limit of a reasonable range,'" [emphasis in original of case cited] and holding that trial judge did not abuse discretion in concluding that "a $75,000 verdict was clearly beyond the maximum limit of a reasonable range and that $45,000 would constitute such a maximum"); *see also Grunenthal v. Long Island R.R. Co.,* 393 U.S. 156, 160, 89 S.Ct. 331, 334, 21 L.Ed.2d 309 (1968) ("trial judge did not abuse his discretion in finding 'nothing untoward, inordinate, unreasonable or outrageous—nothing indicative of a runaway jury or one that lost its head'"); *Saleeby v. Kingsway Tankers, Inc.,* 531 F.Supp. 879, 888 (S.D.N.Y.1981) (substantially same) (Jones Act case); *Filkins v. McAllister Bros., Inc.,* 695 F.Supp. 845, 851 (E.D.Va.1988) (question of excessiveness of verdict is left largely to discretion of trial court) (Jones Act case).

### IV.

■ Plaintiff makes a similar argument in his cross-appeal. He contends that the district court abused its discretion by ordering such a "drastic remittitur of the lost earnings award" and asks this court to reinstate the jury's special damage award.

But plaintiff's cross-appeal need not detain us. The rule is now clear that "a plaintiff in federal court ... may not appeal from a remittitur order he has accepted." *Donovan,* 429 U.S. at 650, 97 S.Ct. at 837; *see also Fiacco v. City of Rensselaer,* 783 F.2d 319, 333 (2d Cir.1986) ("when a plaintiff has agreed to a remittitur order, he cannot challenge it either on an appeal ... or on a cross appeal....." (citations omitted)), *cert. denied,* 480 U.S. 922, 107 S.Ct. 1384, 94 L.Ed.2d 698 (1987). This court made an exception to that rule in a case in which we vacated the district court's judgment that had conditioned a new trial on a remittitur. *Akermanis v. Sea–Land Serv., Inc.,* 688 F.2d 898, 903–04 (2d Cir.1982), *cert. denied,* 461 U.S. 927, 103 S.Ct. 2087, 77 L.Ed.2d 298 (1983), *cert. denied,* 464 U.S. 1039, 104 S.Ct. 700, 79 L.Ed.2d 165 (1984). Under those circumstances, it is "conceptually difficult and

---

**8.** Indeed, in light of the fact that Judge Weinstein employed the least intrusive standard—*i.e.,* the standard that is most deferential to the ver-

dict of the jury—we are, as suggested above, even less willing to find that he abused his discretion.

practically unfair to think of the plaintiff as having waived a cross-appeal by consenting to a judgment that no longer exists." *Id.* at 903. That exception is not applicable here. Plaintiff in this case opted for the remittitur and consented to the reduced verdict, and the judgment has not been vacated on appeal. As a result, he may not now challenge the remittitur. The cross-appeal is, accordingly, dismissed.[9]

## V.

◼ Finally, defendants argue that the district court miscalculated the remittitur by factoring back into the award an unspecified amount for maintenance and cure after having previously dismissed the plaintiff's maintenance and cure claim during the trial. We agree.

It has been clear, at least since *Dimick v. Schiedt*, 293 U.S. 474, 55 S.Ct. 296, 79 L.Ed. 603 (1935), that while a remittitur is permissible, an additur is not. *Crane v. Consolidated Rail Corp.*, 731 F.2d 1042, 1046 (2d Cir.), *cert. denied*, 469 U.S. 854, 105 S.Ct. 179, 83 L.Ed.2d 114 (1984); *Akermanis*, 688 F.2d at 902. In theory, just as courts permit remittiturs, they could also permit "additurs"—that is, courts could be permitted to require defendants to choose either a new trial or a court-*increased* verdict. Indeed, that is the practice in some state courts. *See, e.g., Jehl v. Southern Pac. Co.*, 66 Cal.2d 821, 59 Cal.Rptr. 276, 427 P.2d 988 (1967) (Traynor, C.J.); *O'Connor v. Papertsian*, 309 N.Y. 465, 131 N.E.2d 883 (1955). Yet, federal courts treat the doctrines of remittitur and additur asymmetrically. In *Dimick v. Schiedt*, 293 U.S. 474, 55 S.Ct. 296, 79 L.Ed. 603 (1935), the Court concluded that additur could not be employed by federal courts because the procedure involved an unconstitutional reexamination of a jury verdict in violation of the Seventh Amendment. But the Court, in dictum, came to the opposite conclusion with regard to remittiturs:

> [I]f the question of remittitur were now before us for the first time, it would be decided otherwise. But ... the doctrine

has been accepted as the law for more than a hundred years and uniformly applied in the federal courts during that time. And, as it finds some support in the practice of the English courts prior to the adoption of the Constitution, we may assume that in a case involving a remittitur, which this case does not, the doctrine would not be reconsidered or disturbed at this late day.

*Dimick*, 293 U.S. at 484–85, 55 S.Ct. at 300. The Court also distinguished between the two by stressing that while a remittitur "is not without plausible support in the view that what remains is included in the verdict along with the unlawful excess[,] ... an increase by the court is a bald addition of something which in no sense can be said to be included in the verdict." *Dimick*, 293 U.S. at 486, 55 S.Ct. at 301. At the time, Justice Stone wrote a notable dissenting opinion which was joined by Chief Justice Hughes and Justices Brandeis and Cardozo. *Dimick*, 293 U.S. at 488, 55 S.Ct. at 301. To this day, the Court has not questioned the asymmetric treatment by federal courts of the doctrines of remittitur and additur, despite vigorous criticism of the rule. *See generally Jehl*, 66 Cal.2d 821, 59 Cal.Rptr. 276, 427 P.2d 988 (reviewing history and offering criticisms of Court's reasoning in *Dimick*); Sann, Remittiturs (and Additurs) in the Federal Courts: An Evaluation with Suggested Alternatives, 38 *Case W.Res.L.Rev.* 157 (1987–88) (same).

In this case, the district court had dismissed the claim for maintenance and cure before the remittitur was calculated. *See* Note 2, *supra*. Thus, adding back an award for maintenance and cure five months after it had dismissed that claim constituted an additur which must be stricken from the final award.

## CONCLUSION

To summarize, we hold: (1) the district court's charge to the jury regarding contributory negligence did not constitute plain error; (2) the district court's charge to the jury concerning pain and suffering

---

9. Assuming for the argument that we had jurisdiction to consider plaintiff's cross-appeal, plaintiff's claim would still fail. Plaintiff's argument regarding the size of the remittitur, like

defendants', is based on an assertion that Judge Weinstein abused his discretion. As already noted, however, the record does not support such a claim.

and loss of life's pleasures did not constitute reversible error; (3) the district court did not abuse its discretion in not unconditionally ordering a new trial; (4) the district court used the proper standard for determining the remittitur and did not abuse its discretion by choosing the remittitur that it did; (5) having agreed to the remittitur order, plaintiff cannot ·challenge it on cross-appeal; and (6) the district court's final damage award includes an unspecified amount for maintenance and cure which constitutes an additur and must therefore be stricken from the final award.

Because it is not entirely clear how much of the extra $40,000 in the final award corresponds to maintenance and cure—according to the plaintiff, the amount was $10,500, and according to the defendants, it was $15,087—we remand to the district court for the sole purpose of calculating and then striking that part of the final award which corresponds to the impermissible "additur" for maintenance and cure. In all other respects, we affirm the judgment of the district court.