LYNCH, Chief Judge,
concurring in part, dissenting in part, and dissenting in the judgment.
I join two of the majority’s holdings: (1) that evidence of Callahan’s provision of $20 to Evans, as found by the 2009 jury, was not material exculpatory evidence, and (2) that the district court erred in its causation instruction and that this • error prejudiced Callahan. I dissent from the qualified immunity and scope of retrial holdings. On both of those issues, Callahan was and is entitled to judgment as a matter of law, and the case should not be remanded.
I.
As to both issues on which I dissent, some background is provided.
On October 13, 1989, Shawn Drumgold was convicted in Massachusetts state court of the first degree murder of twelve-year-old Darlene Tiffany Moore. The Massachusetts Supreme Judicial Court (SJC) affirmed the conviction on direct appeal in 1996. See Commonwealth v. Drumgold, 423 Mass. 230, 668 N.E.2d 300 (1996). In 2003, a Massachusetts state judge held an evidentiary hearing on Drumgold’s motion for a new trial, based on Drumgold’s allegations of a series of newly discovered defects in the original trial. See Drumgold v. Commonwealth, 458 Mass. 367, 937 N.E.2d 450, 454 (2010). Following the hearing, the Commonwealth of Massachusetts filed a motion to vacate the conviction. Id. The Commonwealth denied that any of Drumgold’s allegations, taken alone, would justify a new trial, but it admitted that, taken together, all of the allegations indicated that “justice may not have been done.” Id. at 454 n. 11. With the defen *55 dant and the prosecutor in agreement that a new trial was warranted, the state judge granted a new trial. Id. at 456-57. She emphasized that her ruling did not mean that Drumgold was factually innocent and did not mean that police or prosecutorial misconduct had been established. See id. at 457.
The evidence before the state judge in 2003 included: (1) that a key eyewitness, Mary Alexander, had been suffering from terminal brain cancer at the time of her testimony, a condition which caused memory loss, id. at 454-55; (2) that another key eyewitness, Tracie Peaks, had recanted her 1989 testimony and now claimed that it had been coerced, id. at 455 n. 12; (3) that a third identification witness had also recanted his 1989 testimony, id. at 456 n. 15; and (4) that Ricky Evans had recanted his 1989 testimony and that there had been undisclosed promises made to Evans regarding pending criminal charges against him and regarding the provision of housing and meals to him, id. at 455-56.
Having considered all of these grounds cumulatively, the judge vacated Drum-gold’s conviction, finding that he had been denied his right to a fair trial. Id. at 457. The judge emphasized that “nothing in [her] ruling in any way should be construed as a specific finding or determination ... as to any grounds advanced by [Drumgold] in his motion for a new trial.” Id. After the state court’s decision, the Commonwealth filed a nolle prosequi, ending all criminal proceedings against Drum-gold arising out of the 1989 murder. Id. at 452.
Drumgold then filed a lawsuit against the Commonwealth in state court under the Massachusetts Erroneous Convictions Law, Mass. Gen. Laws ch. 258D, which provides for compensation up to $500,000 for victims of wrongful convictions, id. § 5. On application for direct appellate review of the denial of the Commonwealth’s motion for summary judgment in that case, the SJC ruled that Drumgold was an eligible claimant under the statute. Drumgold, 937 N.E.2d at 452; see Mass. Gen. Laws ch. 258D, § 1. As the SJC’s decision made clear, the combination of the various grounds offered in the new trial motion, and particularly the allegations regarding Alexander, were very serious. See Drumgold, 937 N.E.2d at 457-58. The present appeal involves only a portion of the fourth ground described above. The state case settled after remand; there is no public record of the amount the Commonwealth paid in settlement.
Meanwhile, in 2004, Drumgold also filed a federal lawsuit that led to this appeal.[18] In the district court, Drumgold asserted claims under 42 U.S.C. § 1983 and Massachusetts General Laws ch. 12, § 111, against the City of Boston and three police officers, including Callahan. At the first trial of Drumgold’s claims, in 2008, the jury concluded that Callahan had not in fact withheld or manufactured evidence relating to Mary Alexander or Tracie Peaks. As to Ricky Evans, the 2008 jury found that Callahan had not solicited false statements from him regarding the night of the murder, and had only withheld evidence relating to certain cash payments to Evans, the amount of which the jury did not determine. On the twenty-fifth day of trial, the jury hung on the question of whether those payments had been a legal cause of Drumgold’s injury.[19]
*56 Nonetheless, the district court granted a retrial on all of Drumgold’s claims relating to Ricky Evans. As a result of the second trial, in 2009, Drumgold obtained a $14 million verdict — approximately a million dollars per year for each year he spent in prison, a rate we have described as “extremely generous” in wrongful conviction cases. Limone v. United States, 579 F.3d 79, 106 (1st Cir.2009). Unlike the panoply of reasons the state court gave as the basis for vacating Drumgold’s conviction, the basis for the 2009 damages award was solely that Callahan had withheld evidence of housing benefits and money benefits he had provided to Ricky Evans. See Drumgold v. Callahan, 806 F.Supp.2d 405, 408 (D.Mass.2011). That verdict was infected with error due to its jury instructions, as the majority holds. In addition, part of the 2009 jury’s verdict directly contradicted part of the jury’s decision in the first trial: the 2008 jury determined that Callahan had not withheld evidence about housing Evans in a hotel; the 2009 jury found that he had.
II.
A. Qualified Immunity
In my view, the law requires that Callahan be granted qualified immunity.[20]
In a qualified immunity inquiry, the court must ask (1) whether the plaintiff has made out a violation of a constitutional right, and (2) whether that right was “clearly established” at the time of the violation — although the court need not necessarily address the questions in that order. See Maldonado v. Fontanes, 568 F.3d 263, 269-70 (1st Cir.2009) (citing Pearson v. Callahan, 555 U.S. 223, 232, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009)). The “clearly established” prong, in turn, encompasses two questions: whether the right was, in general, “sufficiently clear that a reasonable official would understand that what he [was] doing violate[d] that right,” id. at 269 (quoting Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)) (internal quotation mark omitted); and whether, under the particular facts of the case, a reasonable defendant would have understood that he was violating the right, id.
As the majority recognizes, the $20 that Callahan gave to Evans, as found by the 2009 jury, was not material exculpatory evidence. Drumgold thus failed to make out a constitutional violation as to the money, and Callahan is entitled to qualified immunity on that issue under the first prong of the qualified immunity analysis. *57 The only remaining issue, then, is whether Callahan was entitled to qualified immunity on the claim that he did not disclose to the prosecution in Drumgold’s murder case that Ricky Evans was being housed in a hotel.
Callahan was clearly entitled to immunity, on several grounds.[21] The law was not clearly established in 1989 that Callahan was under any duty to disclose such information, and a reasonable police officer in Callahan’s position would not have understood that his alleged actions regarding Evans’s housing violated a constitutional right.
This court has explained very recently that, at least until 1995, it was not clearly established that the affirmative disclosure obligation imposed on prosecutors by Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), applied to police officers. See Haley v. City of Boston, 657 F.3d 39, 48-49 (1st Cir.2011). “By its terms, Brady applied only to prosecutors.” Id. at 48. Even after 1995, when the Supreme Court decided Kyles v. Whitley, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), the role of police officers in the Brady calculus remained “indirect,” as that case held “that the disclosure obligation imposed by Brady extends to evidence known only to police officers, but that the responsibility for obtaining and disclosing such evidence remains the duty of the prosecutor.” Haley, 657 F.3d at 49 (citing Kyles, 514 U.S. at 437-38, 115 S.Ct. 1555).
It certainly was not clearly established in 1989 that a police officer in Callahan’s position had an affirmative obligation under Brady to disclose potential impeachment evidence of the sort at issue here. Indeed, it is not clearly established today. See, e.g., Reid v. Simmons, 163 F.Supp.2d 81, 84 (D.N.H.2001) (describing “the circumstances under which police officers may be held civilly liable for Brady violations” as “a matter of considerable uncertainty”), aff'd, 47 Fed.Appx. 5 (1st Cir.2002) (per curiam). Compare Jean v. Collins, 221 F.3d 656, 660 (4th Cir.2000) (en banc) (Wilkinson, J., concurring in the judgment) (“[T]o speak of the duty binding police officers as a Brady duty is simply incorrect. The Supreme Court has always defined the Brady duty as one that rests with the prosecution.”), with Newsome v. McCabe, 256 F.3d 747, 752-53 (7th Cir.2001) (“The Brady principle was announced in 1963, and we [have] applied it ... to affirm a hefty award of damages against [police] officers who withheld exculpatory information in 1981.”).
Both of the parties and the trial judge conceived of the housing and money issues as Brady issues throughout the district court proceedings.[22] For example, at the *58 pretrial conference before the 2008 trial, the district court described one of the “principal constitutional rights” at issue in the case as “Brady violations.” In both 2008 and 2009, Drumgold relied on Brady (and on Kyles — a case that post-dated Callahan’s alleged actions) in requesting jury instructions on a police officer’s duty to disclose evidence to the prosecution. Before the 2008 trial, the district court issued a document titled “Proposed Brady Instruction.” In the charge conference preceding the 2008 jury instructions, Callahan’s counsel engaged in a lengthy discussion with the court regarding the lack of clarity about how to apply Brady to the situation in Drumgold’s case. In Callahan’s renewed motion for judgment as a matter of law following the 2009 trial, and in Drumgold’s opposition to that motion, the parties argued for or against entering judgment for Callahan on the basis of whether a Brady violation had occurred. The district court echoed this understanding at the hearing on Callahan’s motion, and a Brady theory was the basis of the court’s denial of qualified immunity. See Drumgold, 806 F.Supp.2d at 409, 417-19.
The district court’s reason for denying immunity was error, as the majority admits. Because Callahan was not subject to a clearly established Brady duty in 1989, any alleged violation of Brady’s, dictates cannot be the basis for denying Callahan qualified immunity. The district court’s reasoning cannot survive our decision in Haley. On this point, the majority and I agree.
However, the majority then attempts to rescue the district court’s qualified immunity ruling by instead relying on a line of pre-Brady cases that neither the parties nor the trial judge ever used to support their arguments about the hotel evidence. In fact, these cases — primarily Mooney v. Holohan, 294 U.S. 103, 112-13, 55 S.Ct. 340, 79 L.Ed. 791 (1935) (per curiam), and Pyle v. Kansas, 317 U.S. 213, 216, 63 S.Ct. 177, 87 L.Ed. 214 (1942) — are not even cited in Drumgold’s brief before this court.[23]
There are a number of problems with the majority’s argument. First, the Mooney line of cases is an afterthought, not briefed by the parties nor explicated in the record. It is unfair to Callahan to deny immunity based on an argument that was not preserved and as to which he had no notice. See DeMayo v. Nugent, 517 F.3d 11, 15 (1st Cir.2008) (stating that defendants who had used one Fourth Amendment theory to justify their actions before the district court could not “switch their theories on appeal” to a different Fourth Amendment reasoning); United States v. Slade, 980 F.2d 27, 31 (1st Cir.1992) (rejecting argument that “only new facts and not new arguments about those facts are prohibited from debuting in the court of appeals” and concluding that “the raise-or-waive rule applies with full force when an appellant tries to present a new theory about why facts previously placed on record are determinative”). This court may not create an argument for a party and may not deny immunity based on a different theory than that presented at trial. *59 Such restraint is particularly important in the context of qualified immunity, which, after all, encompasses immunity from having to go to trial at all.
The majority’s rejoinder that a mere citation to Brady without a citation to Mooney and Pyle suffices is off point.[24] Callahan lacked fair notice of the argument that the hotel evidence — without more — implicated a Mooney-based due process right. As explained above, all involved in the trial believed that the hotel evidence issue was governed by Brady. It is only the majority which has recharacter-ized the hotel claim as a non -Brady claim.
The majority appears to take the position that this distinction among various due process arguments means Brady does not govern. Not so. As we stated in Haley, it is necessary to distinguish Brady-based claims from Mooney-based claims when conducting a qualified immunity analysis. See 657 F.3d at 46. The two categories do not always cover the same types of claims, because they implicate two different facets of a criminal defendant’s due process rights: under Mooney, the right to be free from a deliberately contrived conviction, and under Brady, the right to receive material exculpatory evidence known to the prosecution regardless of the prosecutor’s good or bad faith.
The majority recognizes that this court has been “careful to distinguish” between the principles of Mooney and Brady. Yet the majority then goes on to elide this very distinction by treating “Drumgold’s invocation of Brady as shorthand for his full complement of due process rights.” This conflation of the two types of due process rights does not comport with our precedent. The only possible way to connect Drumgold’s explicitly Brady-based claims regarding the hotel to his apparently Mooney-based claims regarding intentional framing would be to treat the hotel evidence as proof that Callahan had induced Evans to give perjured testimony. But, as I detail below, both juries found precisely to the contrary: they rejected the allegation that Callahan had elicited false statements from Ricky Evans about Evans’s observations on the night of the murder. Without even this tenuous connection to Mooney, all that is left is a Brady claim, which is exactly how the parties argued the hotel question and how the district court decided Callahan’s motion for judgment as a matter of law following the final 2009 verdict. That is why it is inappropriate for this court to now insert a Mooney argument where none existed before — and even more, to do so to defeat immunity.
On this basis alone, Mooney and Pyle cannot provide a justification for denying Callahan immunity. But even if one were to accept arguendo that Mooney and Pyle may be brought late to the case, and the theory of liability altered on appeal, the juries’ findings preclude the conclusion that these cases defeat Callahan’s argument for qualified immunity. Under the facts as found by both the 2008 and 2009 juries, a reasonable police officer in Callahan’s position in 1989 would not have known that his actions ran afoul of Mooney and Pyle, and, in fact, would have had every reason to think they did not.
The majority states that Mooney and Pyle identified a due process violation where the state procures a conviction by the knowing use of perjured testimony and the deliberate suppression of exculpatory
*60 evidence.[25] See Mooney, 294 U.S. at 112-13, 55 S.Ct. 340; Pyle, 317 U.S. at 216, 63 S.Ct. 177. Since the rule of these cases was clearly established in 1989, the majority reasons, Callahan is not entitled to qualified immunity, because he deliberately suppressed evidence. That is not what the juries’ findings establish. While, in my view, Callahan was entitled to qualified immunity as a legal matter when the district court erroneously denied it on Brady grounds, the juries’ verdicts certainly meant he was entitled to immunity.
Drumgold’s original complaint alleged that Callahan had fed Evans details of the crime and had “suggested” that Evans select Drumgold as the shooter from an array of photographs. The complaint separately alleged that Callahan had promised Evans assistance with his pending criminal charges and had failed to disclose the hotel or cash assistance.[26] But unlike in other cases where, because of their procedural postures, we have had to accept such allegations in the light most favorable to the plaintiffs, see, e.g., Haley, 657 F.3d at 46; Limone v. Condon, 372 F.3d 39, 43 (1st Cir.2004), here we have the benefit of a jury’s findings upon a fully developed record. As material to the purported Mooney and Pyle theory and the immunity question, those findings rejected all of Drumgold’s relevant allegations.
The 2008 jury found that Callahan had not manufactured evidence, withheld evidence, or procured false statements regarding Evans’s observations on the night of the murder, Evans’s stay in the hotel, or the disposition of Evans’s criminal cases. That jury also rejected allegations that Callahan had manufactured evidence or procured false statements with regard to Mary Alexander and Tracie Peaks. These findings alone required immunity to be granted, as I explain.
The 2009 jury did not reconsider the allegations relating to witnesses other than Evans, and it found again that Callahan had not obtained any false statements from Evans regarding the night of the murder and had not withheld evidence relating to Evans’s criminal charges. The 2009 jury did find that Callahan had withheld evidence regarding the housing and money provided to Evans. But as the majority has explained, withholding information about $20 was no constitutional violation at all.
The juries’ findings clearly demonstrate that this is not a case about the deliberate creation of false evidence, the knowing submission of perjured testimony, or the attempt to frame an unwitting suspect— that is, the types of misconduct contem *61 plated by Mooney and Pyle. See, e.g., Limone, 372 F.3d at 44 (applying Mooney and Pyle to deny dismissal on qualified immunity grounds where plaintiff credibly alleged that police officers had developed a key witness’s perjured testimony in order to cover for the real murderers). Rather, it is a case about affirmative disclosure obligations.
Mooney and Pyle did not clearly establish a rule governing what a police officer must affirmatively disclose; indeed, Brady itself recognized that the earlier cases did not establish affirmative disclosure obligations, as it described its own holding as “an extension” of Mooney. 373 U.S. at 86, 83 S.Ct. 1194. Nothing in Mooney or Pyle would have put Callahan on notice that the Constitution required him to disclose that Evans had been housed at a hotel. In fact, that is a common accommodation to secure the attendance at trial of a prosecution witness, and hardly surprising information to the criminal bar.
In Limone, we held that, as of 1967, it was clearly established under Mooney that police officers were prohibited from “deliberately fabricating evidence and framing individuals for crimes they did not commit.” 372 F.3d at 45, 47-48. A reasonable officer in Callahan’s position in 1989 would not have viewed the alleged nondisclosure of the hotel accommodations as falling within that proscription. Such an officer would have viewed those actions as, if anything, falling under Brady, and no contemporaneous case law held to the contrary.
The Supreme Court has recently reiterated that to deny qualified immunity, “existing precedent must have placed the statutory or constitutional question beyond debate.” Ashcroft v. al-Kidd, — U.S. -, 131 S.Ct. 2074, 2083, 179 L.Ed.2d 1149 (2011). The majority’s conclusions cannot be squared with this command.
Although Mooney and Pyle may support a denial of qualified immunity where, at the motion to dismiss stage, the plaintiff has credibly alleged that the police committed a particularly egregious act of deliberately concealing material exculpatory evidence from prosecutors, see Haley, 657 F.3d at 49-51, this is not such a case. Nor is it even close to being such a case. The juries’ findings do not permit any inference that Callahan’s actions were part of an attempt to frame Drumgold through perjured testimony. Because the juries rejected the claim that Callahan had procured false statements from Evans about the night of the murder, the framing theory must fall away. If Callahan did not induce Evans to lie, the hotel lodging could not have been evidence of an inducement to lie.
Further, in the instances where the juries did find that Callahan withheld evidence, they made no express finding that Callahan acted with the purpose of suppressing such evidence. The holdings of Mooney, Pyle, and their progeny prohibit behavior that is characterized by specific intent: they hold that state actors, knowing that certain evidence or testimony is false, must not deliberately use that evidence for the purpose of obtaining a tainted conviction.[27] Because 42 U.S.C. § 1983 does not provide a source of substantive *62 rights, but rather provides “a method for vindicating federal rights elsewhere conferred,” Baker v. McCollan, 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979), a § 1983 plaintiff who alleges a violation of the constitutional principle recognized in Mooney and Pyle must prove that the defendant had the state of mind those cases require. See Graham v. Connor, 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (“The validity of the [§ 1983] claim must ... be judged by reference to the specific constitutional standard which governs that right.”). Given all of the ambiguity as to disclosure obligations outlined above, as well as the juries’ findings, this record requires that immunity be granted.
It is clear that there was no finding of specific intent. Not only were the district court’s jury instructions on state of mind confusing or even contradictory in both trials,[28] but because the court stated that it was supposed to be giving a Brady instruction, the particular state of mind requirements of Mooney and Pyle never entered the picture. The 2008 verdict slip, which essentially exonerated Callahan, made no reference to his state of mind at all. The 2009 verdict slip asked whether Callahan “intentionally or recklessly” withheld evidence, so the jury could have found liability without finding specific intent.[29]
Beyond that, the evidence at trial showed that, in 1989, Callahan had informed at least one member of the district attorney’s office about Evans’s staying in the hotel, although he apparently did not tell the specific prosecutor in the Drum- *63 gold murder trial. See Drumgold, 806 F.Supp.2d at 410-11 & nn. 5-6. This evidence of disclosure demonstrates that Callahan was not deliberately hiding the information from the district attorney’s office in order to procure Drumgold’s conviction.[30]
Under these circumstances, it unduly strains the principle recognized in Mooney and Pyle to hold that a reasonable officer in Callahan’s position would have known that failing to disclose the hotel evidence would be a violation of Drumgold’s due process rights. Where, as here, the jury’s findings do not permit a theory of intentional framing, nor include a finding of the requisite knowledge or intent, the pre-Sra-dy eases are not on point. To hold otherwise is to blur the line between Brady’s no-fault nondisclosure obligation and Mooney and Pyle’s proscription against the knowing and deliberate use of false evidence.
This is exactly the kind of situation for which qualified immunity was designed, even against the background of Haley and Limone. Callahan’s circumstances are a far cry from those alleged in those two cases, where plaintiffs claimed that the police were “intentionally framing an accused person” by a “deliberate attempt to secure a conviction, without regard to actual guilt or innocence,” Haley, 657 F.3d at 46 — not that the police disclosed evidence in a less-than-thorough manner. The doctrine of qualified immunity “protects all state actors except ‘the plainly incompetent [and] those who knowingly violate the law.’ ” Haley, 657 F.3d at 47 (quoting Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)). The juries’ findings reveal that Callahan does not fall into either category. Remanding the case for yet a third trial, when Callahan was clearly entitled to qualified immunity no later than the first trial, denies him the benefit of those juries’ findings, in violation of his Seventh Amendment rights and his immunity rights. Callahan is entitled to qualified immunity, and judgment should enter for him on that basis.
B. The Scope of the 2009 Retrial
The district court erred in ordering a retrial of the hotel issue before the second jury, abusing its discretion. It did so in derogation of Callahan’s Seventh Amendment rights. The retrial jury should not have been permitted to reexamine the question of whether Callahan withheld the hotel evidence, since that question was resolved in his favor during the 2008 trial. That question was not so inextricably intertwined with the money issue as to require a full retrial. The district court should have ordered a retrial on the money issue only: that is, the court should have asked the second jury to determine whether Callahan had deliberately suppressed *64 evidence that he gave Evans money, the amount of such money (if any), whether the sum was material, and whether the withholding of that information caused Drumgold’s injury.
In the 2008 trial, the district court divided the jury deliberations into two phases. In the first phase (the “violation” phase), the jury was to decide, inter alia, whether Callahan violated Drumgold’s right to a fair trial by withholding evidence that Callahan arranged free housing for Evans and/or that Callahan gave Evans “substantial amounts of money.”[31] If the jury answered “yes” to either or both of these questions, the second phase (the “causation” phase) would ask the jury to decide whether such withholding was the cause of Drumgold’s injury. The 2008 jury thus potentially faced four questions: (1) whether Callahan withheld housing evidence; (2) whether Callahan withheld money evidence; (3) whether withholding the housing evidence caused Drumgold’s injury; and (4) whether withholding the money evidence cause Drumgold’s injury.
In the first phase, the 2008 jury determined that Callahan had not withheld evidence regarding the housing but had withheld evidence regarding the money; that is, it answered “no” to question 1 and “yes” to question 2. Following the verdict in the first phase, the parties declined the district court’s suggestion that the jury be instructed to clarify what amount of money constituted a “substantial amount.” In the second phase of deliberations, the jury never reached question 3 because it had answered “no” to question 1. It then hung on question 4: whether Callahan’s provision of money to Evans had caused Drum-gold’s injury.
After the district court declared a mistrial, Callahan moved for entry of final judgment as to, inter alia, the housing issue, and he sought to restrict the scope of the retrial to the causation question with regard to the money. Because the housing issue was separate from the money issue and had been decided by a jury, it should not have been retried.
The district judge, however, denied Callahan’s motion, stating that a limited retrial which did not reopen the housing questions was not feasible because
[a] second jury would obviously have to be instructed that Callahan had violated Drumgold’s civil rights by giving him “substantial amounts of money” and not disclosing it. The jury would be left with the ambiguity of what “substantial money” meant — an issue wholly unresolved in the first trial, notwithstanding the Court’s efforts to seek further clarification. And the only way to resolve that ambiguity would be to relate each side’s evidence concerning the treatment of Ricky Evans_ In short, all aspects of Ricky Evans’s portion of this case would be involved.
On this basis, the district judge allowed the retrial jury to revisit both “violation” questions — that is, whether Callahan had failed to disclose that he had given housing *65 benefits to Evans and whether he had failed to disclose that he had given money to Evans. This rationale does not in fact explain why the housing issue should have been subject to retrial.
A partial retrial is permissible under the Seventh Amendment when some, but not all, issues in a case have been properly and conclusively resolved by a jury verdict. Gasoline Prods. Co. v. Champlin Refining Co., 283 U.S. 494, 500, 51 S.Ct. 513, 75 L.Ed. 1188 (1931). In order for a partial retrial to be appropriate, it must “clearly appear[]” that the remaining issues are “so distinct and separable from the others that a trial of [them] alone may be had without injustice.” Id.
The decision whether to grant a full or a partial retrial is generally committed to the discretion of the trial judge, see Sprague v. Boston & Me. Corp., 769 F.2d 26, 28 (1st Cir.1985), and thus our review is for abuse of discretion, see Winn v. Lafayette Town House, 839 F.2d 835, 837 (1st Cir.1988); Sprague, 769 F.2d at 28. An error of law, here an error as to the dictates of Gasoline Products, constitutes an abuse of discretion. A district court may also abuse its discretion when it misapprehends the nature of the relationship between the issues sought to be retried, Winn, 839 F.2d at 836-37, or when it does not give an adequate basis in the record for its determination that a full retrial is necessary, Crane v. Consol. Rail Corp., 731 F.2d 1042, 1049-51 (2d Cir.1984) (Friendly, J.). All three of these types of problems appear in the district court’s retrial order.
First, neither of the primary rationales for ordering a full rather than a partial retrial are present here. Generally, a full retrial is necessary when (1) the original verdict represented a compromise among jurors who could not otherwise agree on multiple issues, or (2) the error infecting one issue in the verdict likely spread to the others. See 11 Wright & Miller, Federal Practice & Procedure § 2814 (2012); see also Phav v. Trueblood, Inc., 915 F.2d 764, 767-68 (1st Cir.1990) (explaining compromise verdicts and citing cases). Indeed, in Vizzini v. Ford Motor Co., 569 F.2d 754 (3d Cir.1977), the court observed that partial retrials should be granted “only in those cases where it is plain that the error which has crept into one element of the verdict did not in any way affect the determination of any other issue.” Id. at 760 (quoting Romer v. Baldwin, 317 F.2d 919, 922-23 (3d Cir.1963)) (internal quotation marks omitted).
Significantly, when a jury answers special interrogatories rather than giving a general verdict, courts have more readily preserved the jury’s findings and ordered partial rather than full retrials. See, e.g., LaPlante v. Am. Honda Motor Co., 27 F.3d 731, 738 (1st Cir.1994) (remanding for new trial only on liability and not on damages, where damages award was distinct and separable, “particularly” because the first jury answered “detailed interrogatories” on how it arrived at the damages number). In Crane v. Consolidated Rail Corp., 731 F.2d 1042, Judge Friendly noted that when a trial court uses special interrogatories, the “trial or reviewing court may be reasonably certain that an erroneous verdict was reached independent of another verdict,” and unless there are “obvious inconsistencies,” the court should presume that each of the jury’s answers is a “good faith response[ ] to the question[] presented.” Id. at 1050 (quoting Akermanis v. Sea-Land Serv., Inc., 688 F.2d 898, 906 (2d Cir.1982)) (internal quotation mark omitted).
There were no inconsistencies here, much less obvious ones. Neither party has argued that the 2008 jury was confused when it gave its special verdict an *66 swers, or that the jury’s indecision on causation as to the money “infected” its decision about the lack of violation as to housing. Nor was that the rationale of the trial judge in the order on the scope of the retrial.
This is also not a situation where, considering the totality of the circumstances, the issues were too “interwoven” to retry one issue separately. See 11 Wright & Miller § 2814. This case does not involve the much more common retrial issue of the “interwovenness” of liability and damages, see id., nor even the (somewhat more analogous) interwovenness of violation and causation, see, e.g., Bohack Corp. v. Iowa Beef Processors, Inc., 715 F.2d 703, 709 (2d Cir.1983) (affirming district court’s order of full retrial on Robinson-Patman Act claims after first jury found that defendant violated the Act but hung on whether violation caused plaintiffs injury). Rather, the problem is the purported interwovenness of two distinct substantive issues— i.e., the hotel and the cash.
In ordering a retrial on both of those issues, the district court departed from Gasoline Products Co. v. Champlin Refining Co., 283 U.S. 494, 51 S.Ct. 513, 75 L.Ed. 1188, the very case that established the constitutional propriety of partial retrials. That case demonstrates that separate claims involving a shared set of facts can fairly be, and should be, separated on retrial. In Gasoline Products, the plaintiffs claim alleged breach of a license contract, and the defendant’s counterclaim alleged that the license contract was executed in consideration for separate oral and written contracts that the plaintiff had breached. Id. at 495-96, 51 S.Ct. 513. While the Supreme Court held that liability and damages on the counterclaim were too “interwoven” to retry separately, id. at 500, 51 S.Ct. 513, it did not so hold with regard to the relationship between the claim and counterclaim, even though a retrial on the counterclaim would likely have included factual allegations relating to the license contract.
Similarly, in Drumgold’s case, the first jury’s answers to the special verdict questions show that the first jury was able to separate the two “violation” issues even though they involved a shared set of facts. In other words, while it may have risked confusion to ask the second jury to evaluate causation on the money question without also evaluating violation on the money question, there is no indication that a retrial jury would have been confused if it were asked to evaluate the entire money question without being allowed to reopen the hotel disclosure issue. The presence of an overlapping factual background to distinct issues is not enough to overcome the Seventh Amendment and retry an issue already determined by a jury.
If necessary in order to fairly present Drumgold’s case, evidence as to the circumstances under which Callahan gave cash to Evans, including some evidence of the housing, could have been admitted at the second trial without having to reopen the hotel violation issue. The jury could have been instructed that Callahan had not withheld evidence about the housing and had not violated any rights in that regard, and that that issue was not open; any hotel evidence was limited to providing background. Juries are often asked to accept evidence for one purpose but not another, see Fed.R.Evid. 105; United States v. Tse, 375 F.3d 148, 157-58 (1st Cir.2004), and we presume that juries will follow the instructions that the district court gives them, United States v. Griffin, 524 F.3d 71, 78 (1st Cir.2008). Here, the district court even recognized this possibility, initially stating that the second trial could “cover the entire story [of Evans and Callahan], but the only question that that *67 jury would be asked is about the money.” Indeed, the judge followed an almost identical course with regard to the use in the second trial of evidence about Tracie Peaks and Mary Alexander.
The trial judge also could have avoided jury confusion by limiting the introduction in the second trial of certain evidence specifically pertaining to the hotel, on the ground that, given a retrial of limited scope, such evidence’s probative value was substantially outweighed by the risk of confusing or misleading the jury into considering questions not before it. See Fed.R.Evid. 403.
The district court’s order on the scope of the retrial does not seriously consider these possibilities, nor explain the relevant distinctions between the violation and causation questions, nor point to evidence in the record supporting the proposition that retrying both the hotel and money issues in their entirety was necessary to prevent jury confusion. The order explains why a causation-only retrial would be unworkable, but it fails to explain why that means that the hotel-violation question should be reopened. The court merely states that “all aspects of Ricky Evans’s portion of this case would be involved” in a retrial because of the ambiguity of the first jury’s finding of “substantial amounts” of money. The order does not explain why this situation would make the hotel issue inextricable from the money issue. See Crane, 731 F.2d at 1050 (“The memorandum opinion of the district judge ... casts little light on why a retrial of the damages issue was thought to be necessary.”). This was not merely, as the majority suggests, the lack of an “extensive elaboration”; it was a failure to justify the basic choice at the heart of the district court’s decision, a choice which I think cannot be justified.
This outcome constitutes an abuse of discretion. In Winn v. Lafayette Town House, 839 F.2d 835, the appellate court reversed the district court’s grant of a full retrial on both liability and damages because the district court confused the relationship between comparative fault (a liability issue) and equitable reduction (a damages issue) in a case under a state comparative negligence statute. Id. at 836-37. In Crane, Judge Friendly reversed the district court’s grant of a new trial on both liability and damages because the court had not shown an adequate basis in the record for its determination that the jury’s verdict on damages was tainted by an error she correctly discerned in the liability verdict. 731 F.2d at 1049-51. Likewise, in this case, the district court abused its discretion by failing to provide a reasoned basis for the legal distinctions underlying its ruling on the scope of the retrial.
As Judge Friendly cogently noted,
[Sjomething more is required to upset a verdict than the conclusory language ... used by the district judge. While we must guard against usurping the trial court’s prerogative with respect to seriously erroneous jury verdicts, we must be equally diligent in protecting the jury’s function. Direction of a new trial on an issue determined by a jury without the articulation of a sufficient basis for such action effects ... “a denigration of the jury system[,] and to the extent that new trials are granted the judge takes over, if [s]he does not usurp, the prime function of the jury as the trier of the facts.”
Id. at 1051 (quoting Lind v. Schenley Indus., Inc., 278 F.2d 79, 90 (3d Cir.1960)). In light of the fact that the first jury was able to separate the hotel and money violation questions, the district court’s explanation for why the second jury would be unable to do so was inadequate to support *68 the decision to set aside a legitimate jury-verdict.
The second trial should have been limited to the money issue only. Since Callahan’s provision of $20 to Evans was not material, the second jury’s verdict on the money issue cannot support a finding of liability for Callahan. He was entitled to judgment as a matter of law.
III.
I dissent from the majority’s decision to remand this case for a third trial. I would reverse the district court’s denial of Callahan’s renewed motion for judgment as a matter of law and its denial of qualified immunity, and order entry of judgment for Callahan.

. Drumgold filed his suit under the Erroneous Convictions Law separately because that statute provides for exclusive jurisdiction in Massachusetts Superior Court. Mass. Gen. Laws ch. 25 8D, § 3.

. The jury rejected all theories of liability for the other police officer who remained as a *56 defendant in the 2008 trial. The district court bifurcated Drumgold's claims against the City of Boston from his claims against the individual police officers. The portion of the case involving the City is stayed pending the outcome of this appeal.

. Callahan has not waived his qualified immunity argument. He raised it at both the 2008 and 2009 trials, including a lengthy colloquy at the jury charge conference in 2008 regarding the applicable law. See Lynch v. City of Boston, 180 F.3d 1, 13 n. 9 (1st Cir.1999) (“[Federal Rule of Civil Procedure] 50(a)(2) is designed to prevent unfair surprise and to provide the responding party with an opportunity to correct any deficiencies in her proof. Our review of the record demonstrates that [plaintiff] could hardly have been surprised by [defendant's assertion of qualified immunity.” (citation omitted)). Moreover, when Callahan again argued for qualified immunity in his renewed motion for judgment as a matter of law following the 2009 jury's verdict, Drumgold did not contend in his opposition to that motion that Callahan had waived the argument. Because Drumgold never argued waiver in the district court, the trial judge did not address the issue in her ruling on Callahan’s post-trial motions. See Drumgold, 806 F.Supp.2d at 417-19. If anything, then, it is Drumgold who has waived the argument that Callahan waived the qualified immunity defense.

. As I explain below in section II.B, Callahan was entitled to the benefit of the first jury's verdict on the hotel housing issue. The 2008 jury found that he did not withhold exculpatory evidence relating to Evans staying in a hotel and being provided with meals. Based on the 2008 jury’s verdict, Callahan should have been granted qualified immunity on the hotel issue under the first prong of the qualified immunity inquiry. However, even if the 2009 jury’s verdict on this point were permissible, Callahan should have been granted qualified immunity on that verdict under the second prong of the analysis, as I explain in this section.

. This treatment was distinct from the parties’ and the court’s view of Drumgold’s allegations that Callahan had manufactured evidence and convinced Evans to give false testimony. Although the framing of these latter allegations was inconsistent throughout the parties’ various filings, they were frequently understood as involving due process rights other than those defined by Brady. The hotel and money issues, by contrast, were consistently treated as Brady issues. Callahan’s arguments about the jury instructions on state of mind, cited by the majority, were premised on the as *58 sumption that Brady applied to police officers under Callahan's circumstances, an assumption later negated by Haley (a case decided in 2011, after both of Drumgold’s trials were over).

. In 2008, Drumgold did request two jury instructions based on these cases, but they both addressed the allegation that Callahan had manufactured Evans’s testimony, not the allegation that he had withheld evidence of benefits. Mooney and Pyle are otherwise absent from Drumgold’s pleadings both in the district court and in this appeal.

. This is not about whether Callahan lacked fair notice that Drumgold had alleged a due process violation based on the intentional use of (non-hotel and cash) false evidence, a claim that, if proved, could have fallen within the scope of Mooney and Pyle.

. The majority characterizes this principle as "the deliberate suppression aspect of Brady.” But Mooney and Pyle, having preceded Brady, cannot fairly be called an "aspect” of the latter case. While the Brady Court did describe its holding as an "extension” of Mooney and Pyle, see 373 U.S. at 86, 83 S.Ct. 1194, the earlier cases stand for their own previously established proposition, which is independent of the later development of Brady and its progeny. As I have explained above, there are important differences between the due process rights identified in each line of cases.
In Mooney, the Court held that, after exhaustion of state remedies, the federal writ of habeas corpus is available to state prisoners who assert, with some colorable support, that state prosecutors knowingly used perjured testimony against them and then knowingly suppressed evidence which could have been used to counter the perjured testimony. See 294 U.S. at 109-10, 55 S.Ct. 340. Pyle, a very short opinion, merely states that such allegations are sufficient to state a claim for habeas corpus. See 317 U.S. at 215-16, 63 S.Ct. 177.

. The complaint did not allege that disclosure of the information about benefits would have revealed the allegedly manufactured testimony.

. See Mooney, 294 U.S. at 112, 55 S.Ct. 340 (“[D]ue process ... cannot be deemed to be satisfied ... if a state has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured.”); Pyle, 317 U.S. at 215-16, 63 S.Ct. 177 (“Petitioner’s papers are inexpertly drawn, but they do set forth allegations that his imprisonment resulted from perjured testimony, knowingly used by the State authorities to obtain his conviction, and from the deliberate suppression by those same authorities of evidence favorable to him.”); Napue v. Illinois, 360 *62 U.S. 264, 269, 79 S.Ct 1173, 3 L.Ed.2d 1217 (1959) (recognizing "[t]he principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction”); Limone, 372 F.3d at 45 ("[TJhose charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals for crimes they did not commit.”); Haley, 657 F.3d at 49 ("Deliberate concealment of material evidence by the police, designed to grease the skids for false testimony and encourage wrongful conviction, unarguably implicates a defendant’s due process rights.”). Compare Brady, 373 U.S. at 87, 83 S.Ct. 1194 (specifying that the due process right recognized in that case applies "irrespective of the good faith or bad faith of the prosecution”).

. In 2008, the trial judge told the jury that in order to find a § 1983 violation, "it's not necessary to find that the defendants had any specific intent to deprive the plaintiff of his constitutional rights[.]... [T]he plaintiff is entitled to relief if the defendant intended the actions which resulted in a violation of his constitutional right.” Yet the judge later instructed that "[i]n order to prevail on a claim that defendants suppressed exculpatory evidence, the plaintiff must prove that one or both of the defendants knew of certain material exculpatory evidence and intentionally and deliberately withheld the information from the prosecutor.” Callahan’s counsel pointed out this contradiction in a colloquy just before closing arguments and objected to the instructions after they were given. In the 2009 trial, the judge first instructed the jury that the § 1983 charge required Drumgold to show "that the defendant either intentionally or recklessly committed the action which then resulted in a violation of the plaintiff’s constitutional rights,” then that Callahan would be liable if he "knowingly and deliberately withheld any material exculpatory evidence from the prosecutor.”

. I do not agree with the majority’s suggestion that recklessness is sufficient to satisfy Mooney's (and related cases’) state of mind requirement. The case that the majority cites for this proposition, Tennison v. City and County of San Francisco, 570 F.3d 1078 (9th Cir.2009), addressed the state of mind required to show a Brady-based § 1983 violation in a situation where Brady was held to apply to police inspectors. See id. at 1087-88. As detailed above, the Mooney and Pyle standard is distinct from the Brady standard. The fact that Callahan invoked "recklessness” in his memorandum of law regarding jury instructions is of no moment when the standard he invoked was inapplicable.

. In denying Callahan’s 2009 post-trial motion for qualified immunity, the district court relied on the theory that Callahan had failed to fulfill his Brady obligation because he had reported the hotel information to the wrong prosecutor. Drumgold, 806 F.Supp.2d at 418-19. This was incorrect under Brady and is even more so under Mooney and Pyle.
The answer to the question of to whom (and how) a police officer ought to disclose potentially exculpatory evidence was not clearly established in 1989, and it is still not clearly established today. Neither party, nor the district court, provided controlling authority or even anything approaching a consensus of persuasive authority on this issue. See Wilson v. Layne, 526 U.S. 603, 617, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999). There was no support for denying qualified immunity on this basis, even under the district court’s Brady-based reasoning. And under the majority’s non -Brady theory, if a reasonable officer in Callahan's position truthfully disclosed evidence to the district attorney’s office — even if the disclosure were later adjudged to be legally insufficient — he would reasonably believe that he was not violating Mooney and Pyle’s prohibition of intentional framing.

. The relevant special verdict questions read as follows:
Has the Plaintiff, Shawn Drumgold, proven by a preponderance of the evidence that Defendant Timothy Callahan violated his right to a fair trial by withholding exculpatory evidence from prosecutors, manufacturing evidence, and/or obtaining false statements regarding Ricky Evans being housed at a hotel and provided with meals?
Has the Plaintiff, Shawn Drumgold, proven by a preponderance of the evidence that Defendant Timothy Callahan violated his right to a fair trial by withholding exculpatory evidence from prosecutors, manufacturing evidence, and/or obtaining false statements regarding Ricky Evans being given substantial amounts of money?